CHRISTOPHER B. E. STROEMER V. JOSIAH A. VAN ORSDEL.[*]

FILED JUNE 8, 1905.    No. 13,800.

1. **Attorney and Client:** CONTRACT: VALIDITY. A contract between an attorney and client for services to be rendered by the former is not necessarily invalid because a part of the services to be rendered is the procurement of legislative action, nor because such contract provides for a contingent fee. *Richardson v. Scott's Bluff County*, 59 Neb. 400, modified.

2. **Contract:** VALIDITY. Such contract will be enforced, unless it appears that it contemplates the use of unlawful or improper means, or that such means were employed in pursuance thereof to attain the object for which the contract was made.

*Rehearing allowed. See opinion, p. 143, *post*.

3. ———: PUBLIC POLICY. While public policy forbids the enforcement of an illegal or immoral contract, it is equally insistent on the enforcement of contracts which are lawful and contravene none of its rules.

ERROR to the district court for Gage county: ALBERT H. BABCOCK, JUDGE. *Affirmed.*

*L. M. Pemberton,* for plaintiff in error.

*Samuel Rinaker, Robert S. Bibb* and *Hazlett & Jack,* contra.

ALBERT, C.

We shall use the terms plaintiff and defendant with reference to the title of the cause in the district court.

The plaintiff alleges that he entered into an oral contract with the defendant, whereby he was employed by the defendant as his agent and attorney to take such action and render such services in the way of collecting facts, preparing and submitting to the Indians and the proper authorities of the federal government arguments on the merits of the claims of those holding lands purchased under the act of congress approved March 3, 1881, providing for the sale of the remainder of the reservation of the confederate Otoe and Missouri tribes of Indians in the states of Nebraska and Kansas, as in the judgment of plaintiff might be necessary and proper to secure from the federal government and said Indians a reduction in the amount which, under the laws of the United States as they then stood, it was necessary to pay to satisfy the unpaid balance due the government by the defendant and other purchasers under said act; that for said services the defendant undertook and agreed to pay the plaintiff a sum equal to ten per cent. of whatever such reduction might be obtained. Among other allegations in the petition, of acts done and services performed by the plaintiff in pursuance of said ·contract, is the following: "That

Stroemer v. Van Orsdel.

thereafter the plaintiff went to Washington city, District of Columbia, and went before the secretary of the department of the interior, and there presented the interests and claims of the defendant and other purchasers of lands under the said act of congress for a rebate and reduction in the amounts still owing to the government for the said lands. And plaintiff urged upon the secretary of the department of the interior his approval of the consent of said Indians to the said rebate and reduction made by the said Indians, as aforesaid, that, as a result of the plaintiff's presentation of the matter aforesaid to the said secretary, the said secretary prepared a bill for an act of congress, and recommended the passage of the same by congress, which said bill was for an act approving and ratifying the said action of the said Indians in consenting to the reduction aforesaid, and authorizing the said secretary to accept payment for said lands in accordance with the reduced terms consented to by the said Indians as aforesaid; that the plaintiff appeared before the committe of the senate of the United States on Indian affairs, and also before a similar committee of the house of representatives, and there again presented the interests of the defendant and other purchasers of lands sold under the said act of congress hereinbefore first mentioned, and urged the claims of the defendant and other purchasers of said lands for a reduction in and a rebate of the amounts due to the government for the lands purchased as aforesaid; that as a result of plaintiff's efforts and services as aforesaid, favorable reports were made by the said committees to their respective bodies upon the said bill, and the same was duly enacted by the congress of the United States, and approved by the president thereof, and became a law of the United States, April 4, 1900, and thereafter and pursuant to said law the government of the United States accepted from the defendant in full payment for the land occupied by him, as hereinbefore stated, the reduced amount hereinbefore alleged." It is further alleged that, by reason of said services performed by the

plaintiff in pursuance of said contract, he obtained for the defendant a reduction of $2,307.83, and that, by reason of the premises, there is now due and owing to the plaintiff from the defendant on said contract the sum of $230.78. There were a verdict and judgment for the plaintiff, and the defendant brings error.

The principal contention of the defendant is that the contract is illegal and contrary to public policy, in that it was a contract to pay a contingent fee for influencing legislation. In order to understand this contention, it is necessary to refer to some of the circumstances which gave rise to the contract, and what was done by plaintiff in pursuance of it. By the provisions of the act of March 3, 1881, above referred to, with the consent of the Otoe and Missouri tribes of Indians, expressed in open council, the secretary of the interior was authorized to survey and to sell the lands of those Indians lying in Nebraska and Kansas. After being surveyed, the lands were to be appraised by three commissioners, of whom one was to be selected by the Indians and two by the secretary of the interior. After such survey and appraisal, the secretary of the interior was authorized to offer it for sale through the land office at Beatrice, in tracts not exceeding 160 acres, to actual settlers or purchasers, who should make oath before the register or receiver at the land office that they intended to occupy the land for authority to purchase which they made application, and who should, within three months after such application, make a permanent settlement upon the same. These sales were to be for cash, or one-fourth in cash to become payable at the expiration of three months from the date of filing the application, one-fourth in one year, one-fourth in two years, and one-fourth in three years from the date of sale. No land was to be sold for less than the appraised value thereof, and in no case for less than $2.50 an acre. There was no provision in the act that the land should be sold at public auction. It was similar to a former act of congress for the sale of a portion of the same Indian reservation,

in pursuance of which the lands had been sold at private sale; and the settlers proceeded on the theory that the sales under the subsequent act would be conducted in the same manner as those under the former act. But, for some reason, the officer charged with the sale of the land put it up for sale at auction to the highest bidder. That his action in this respect was unauthorized, and a hardship was thereby entailed on the settlers and purchasers, is shown by a report made by the committee on Indian affairs to congress, from which we take the following:

"In the total disregard not only of the spirit and letter of the law, but the official assurances * * * after the survey and appraisement of the lands had been completed, to the complete surprise of the intending settlers, the general land office issued an order for a public sale."

"And the tracts were awarded to the highest bidders therefor at prices greatly in excess of the appraised value."

That "the sale was controlled by a mob of disorderly, intoxicated and irresponsible persons; and the intending settlers seeking to secure lands of their selection, and on which they had previously made settlement in accordance with the spirit and purpose of the law, were brought into unfair competition and serious menace from the mob which had gathered for the purpose of speculation and making trouble, and not for the purpose of making actual settlement of the lands through *bona fide* purchase."

"The commissioner of the general land office was present at the sale, endeavored as best he could to protect the *bona fide* intending settlers, and assured them, in his official capacity, that no advantage would be taken of the excessive bidding, and that in the end the government would make a fair and reasonable adjustment, and exact no more from the purchasers than the real and appraised value of said lands. The settlers relied upon these assurances, made the bids necessary to secure the lands, and entered upon them." See report No. 2,198, 55th congress, 3d session, house committee on Indian affairs.

After the sales, the settlers made some efforts to obtain

relief from what was deemed the injustice resulting to them by a sale of the land at public auction instead of at private sale. The merits of their claims were recognized by both the department of the interior and by congress, and on the 3d day of March, 1893, an act of congress went into effect, authorizing and directing the secretary of the interior "to revise and adjust, on principles of equity, the sales of lands in the late reservation of the confederate Otoe and Missouri tribes of Indians in the states of Nebraska and Kansas, * * * and in his discretion, the consent of the Indians first being obtained, * * * to allow to the purchasers of said lands * * * rebates on the amounts respectively paid or agreed to be paid by said purchasers." This act also provides that the rebates allowed should not bring the price to be paid for the lands below its appraised value. It was after this act went into effect that the contract sought to be enforced in this action was made. At the time the contract was made, it was generally understood, and we think properly, that no further legislation was required to enable the settlers to obtain a proper reduction from the amount which they had respectively agreed to pay for the lands. After the contract was made, the plaintiff, acting on behalf of the defendant and other settlers, negotiated an agreement with the Indians, whereby they consented that certain reductions might be made to the settlers. This agreement was submitted to the secretary of the interior by the plaintiff for his approval and enforcement, under and in accordance with the act of congress approved March 3, 1893. The matter was set for hearing, but, before the time for hearing arrived, the plaintiff was taken ill, and was confined to his bed by illness for more than two months. During his illness, the secretary of the interior came to the conclusion that there was some doubt as to his authority to proceed under the authority of the act of March 3, 1893, and prepared and submitted to congress, with his recommendation that it become a law, a bill for an act approving the settlement which the plaintiff had nego-

tiated with the Indians. This bill became a law April 4, 1900. While it was pending in congress, the plaintiff, as the attorney of the defendant and other settlers, appeared and made arguments in favor of the proposed bill before the committees on Indian affairs of both houses. He emphatically denies that he solicited any member of congress to support the bill, or used or tried to use his personal influence with any of such members to secure its passage. It appears from his testimony, which is uncontradicted, that, after his contract with the defendant, the only conversations had by him with individual members of congress in regard to the bill was to inquire on one or two occasions as to its progress, and to answer questions addressed to him by two members as to the nature and object of the bill.

It is insisted that the case falls within the rule announced in *Richardson v. Scott's Bluff County,* 59 Neb. 400, which is as follows:

"A contract by which a person agrees to draft a bill, have it introduced in a legislature, explain it to and make arguments in its favor before committees of the legislature, and do all things needful and proper to secure its passage; such party to receive no compensation unless the passage of the bill, an appropriation act, is procured—if successful, the fees not fixed, but to be liberal—is vicious, illegal and void; and, in the event of the passage of the bill, there can be no recovery of a fee in a suit upon the contract, nor as upon an implied contract, nor a *quantum meruit* for the services performed."

On the other hand it is claimed that there is nothing on the face of the contract to show that it contemplated legislative action; that the facts stated show that such action was not within the contemplation of the parties when the contract was made, and therefore that it was not a contract to procure legislation. But we think the plaintiff should be held to the interpretation which he himself placed upon the contract. By the express terms of the contract, he was to render such services in the way of col-

lecting facts, and preparing and submitting to the proper authorities of the government of the United States arguments upon the merits of the claims, as in his judgment might be necessary and proper. It appears from that portion of the petition hereinbefore quoted that, among the services which the plaintiff deemed "necessary and proper" in the premises, was to appear before the committees of the two houses of congress in support of the proposed bill. It further appears that as a result of his services favorable reports were made by such committees upon the bill, and that it was duly enacted by congress and approved by the president. These facts show, we think, that the contract, as construed by the plaintiff, brings it clearly within the rule announced in the *Richardson* case, *supra*. But after a careful examination of the authorities, we are all of the opinion that the rule in that case is stated too broadly. It is stated more broadly than was necessary to cover that case, the record of which shows a persistent and successful attempt to influence legislation by means of personal influence and solicitation of individual members of the legislature. It is thought a more accurate statement of the rule is to be found in *Trist v. Child*, 21 Wall. (U. S.) 441, where it is said:

"We entertain no doubt that in such cases, as under all other circumstances, an agreement express or implied for purely professional services is valid. Within this category are included, drafting the petition to set forth the claim, attending to the taking of testimony, collecting facts, preparing arguments, and submitting them, orally or in writing, to a committee or other proper authority, and other services of like character."

From a comparison of this rule with that stated in the *Richardson* case, waiving for the present the question of contingent fees, it will be seen that the latter places all contracts for the employment of agents and attorneys to secure legislation under the ban, while under the former, under certain circumstances and within proper limits, such contracts are valid. The rule announced in *Trist v.*

*Child, supra,* above set out, has been frequently recognized by the supreme court of the United States and by state courts of last resort. *Wright v. Tebbitts,* 91 U. S. 252; *Meguire v. Corwine,* 101 U. S. 108; *Oscanyan v. Arms Co.,* 103 U. S. 261; *McBratney v. Chandler,* 22 Kan. 692; *Sedgwick v. Stanton,* 14 N. Y. 289; *Bremsen v. Engler,* 49 N. Y. Super. Ct. 172; *Foltz v. Cogswell,* 86 Cal. 542, 25 Pac. 60; *Moyer v. Cantieny,* 41 Minn. 242; *Denison v. Crawford County,* 48 Ia., 211. The case last cited, owing to its similarity to the case at bar, deserves more than passing notice. There a contract had been entered into between the plaintiff and the defendant county, providing that the plaintiff should make application to the federal government for certain swamp lands, or indemnity therefor, which the county claimed it was entitled to receive, and Denison was to receive for his compensation one-half of what he thus procured. To effect the object of the contract required an act of congress. The county received the indemnity contemplated by the contract, and the plaintiff brought suit for his fee under the contract. The contract was upheld by the court in an opinion, which states the rule applicable to such cases in substantially the same language as that used in *Trist v. Child, supra.* In most, if not all, of the cases cited, however, the courts add this qualification: That if the agent or attorney conceals from the members of the legislative body the capacity in which he is acting, or appears to be other than he actually is, legislation procured thereby may be said to have been obtained by improper means, and a contract to pay a compensation therefor is void as against public policy. In the present case the plaintiff is an attorney at law, and made no attempt to conceal the capacity in which he was acting, or to be other than what he actually was. Hence, the case does not fall within that qualification.

It has been held in some cases that where the fee is contingent, as in this case, there is a strong temptation on the part of the agent or attorney to make use of improper means to effect the desired end, and for that reason a con-

tract to render services before an executive officer of the government, or a legislative body, for a contingent fee is contrary to public policy. In the *Richardson* case, *supra*, considerable stress is laid on this feature of the contract. We do not share the view that such feature of the contract renders it void as against public policy. If the temptation to resort to improper methods is too strong for an attorney, working for a mere fraction of the benefits resulting from his services, it would certainly be far stronger to the real party in interest working in his own behalf and for the whole of the benefits, yet no one questions the right of the party to act in his own behalf in such matters. It would seem to us that to the extent that a contingent fee increases the temptation to the agent or attorney, it diminishes the temptation to the client, so that the sum total of the temptation to employ improper means is unaffected by the character of the fee. Besides, the right of an attorney at law to render services in court for a contingent fee is almost universally recognized in this country. The temptation to resort to improper means before the judiciary is just as strong as it is to resort to such means before the legislative or executive branch of the government, and we have no right to assume that such means would be any more effective in one department than in another. The supreme court of the United States has held more than once, that a contract between an attorney and client is not rendered invalid by a provision for a contingent fee. In *Taylor v. Bemis,* 110 U. S. 42, passing upon the validity of such contract, the court said:

"It was decided in the case of *Stanton v. Embrey,* 93 U. S. 548, 23 L. ed. 983, that contracts by attorneys for compensation in prosecuting claims against the United States were not void because the amount of it was made contingent upon success, or upon the sum recovered. And the well known difficulties and delays in obtaining payment of just claims, which are not within the ordinary course of procedure of the auditing officers of the government, justify a liberal compensation in successful cases,

where none is to be received in case of failure. Any other rule would work much hardship in cases of creditors of small means residing far from the seat of government, who can give neither money nor personal attention to securing their rights."

A contract, whereby an attorney undertakes to procure a pardon for one convicted of crime is not invalid because the compensation is made contingent on success. *Moyer v. Cantieny, supra.* On the validity of such contracts generally see, also, *Wright v. Tebbitts,* and *Denison v. Crawford County, supra. Wylie v. Coxe,* 15 How. (U. S.) 415; *Barber Asphalt Paving Co. v. Botsford,* 56 Kan. 532, 44 Pac. 3; *Aultman v. Waddle,* 40 Kan. 195; *Sedgwick v. Stanton, supra; Hunt v. Test,* 8 Ala. 713, 42 Am. Dec. 659; *Beal v. Polhemus,* 67 Mich. 130; *Wildey v. Collier,* 7 Md. 273, 61 Am. Dec. 346.

In the light of the authorities cited, we are unable to see wherein the contract in suit contravenes any rule of public policy either as to the nature of the services contemplated by the parties when the contract was made, or those rendered in pursuance of it. It is not sufficient to say that the plaintiff might have resorted to illegal or improper means to attain the end contemplated by the contract; that might be said in any case. But the public interest is not well served by indulging baseless suspicions of wrongdoing. While public policy forbids the enforcement of an illegal or immoral contract, it is equally insistent that those which are lawful and contravene none of its rules be duly enforced, and not set at naught or held invalid on a bare suspicion of illegality. Had the defendant done for himself all that is shown the plaintiff did for him in pursuance of the contract, it would have been what is everywhere recognized as a legitimate exercise of his rights as a citizen. If it were competent for the defendant to do those things in his own behalf, we are unable to see why the services of one employed to act for him should be held illegal or contrary to public policy.

Complaint is made of some of the instructions, but such

complaint appears to be disposed of in what has already been said.

It is recommended that the judgment of the district court be affirmed.

DUFFIE and JACKSON, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.

The following opinion on rehearing was filed March 8, 1906.  *Judgment of affirmance adhered to:*

1. Attorney and Client: CONTRACT: VALIDITY.  An agreement for purely professional services, such as "collecting facts, preparing and submitting to the Indians and proper authorities of the government of the United States arguments upon the merits of the claims of those holding Indian lands purchased from the government for a reduction, and upon the justice and advisability of a reduction, of the purchase price of such lands, as may be necessary and proper to secure such reduction," is valid.

2. Contract: PUBLIC POLICY.  The fact that the agent or attorney in carrying out his agreement, and as incidental thereto, appears before a committee of both houses of congress and explains the nature of a bill prepared by the secretary of the interior, authorizing him to grant the reduction of the price of such lands agreed upon, does not render such contract void, or preclude the attorney from recovering the compensation expressed therein for his services.  *Trist v. Child*, 21 Wall. (U. S.) 441.

3. Former opinion herein, *ante*, p. 132, modified and adhered to.

BARNES, J.

Our original opinion in this case, *ante*, p. 132, affirms the judgment of the trial court, and holds that the con·tract on which this action was based is valid and enforceable.  A rehearing has been allowed; the case has been presented to the court by oral argument and on printed briefs, and the question now is shall we adhere to that opinion.  It is stated therein: The contract in question, as construed by the plaintiff in the court below, is clearly

within the rule announced in the case of *Richardson v. Scott's Bluff County,* 59 Neb. 400. Using that expression as a foundation for his contention, counsel for the defendant now strenuously insists that our decision is wrong; that it should be set aside, and the judgment of the trial court reversed, because the contract is one to secure legislation, in other words, is a lobbying contract, and void as against public policy. We are convinced, however, that the statement above is incorrect, and is not fully justified by the record. The contract in question, set forth in the petition of the plaintiff in the court below, is as follows:

"The plaintiff and the defendant entered into an oral agreement, whereby the defendant employed the plaintiff to act for the defendant as his attorney and agent to take such action and render such services in the way of collecting facts, preparing and submitting to the Indians and proper authorities of the government of the United States arguments upon the merits of the claims of those holding lands purchased from the government, as aforesaid, for a reduction, and upon the justice and advisability of such reduction to and for all concerned as in the judgment of the plaintiff might be necessary and proper to secure from the government of the United States, and the said Indians, a rebate or reduction in the amount which, under the laws of the United States as they then stood, it was necessary to pay to the government of the United States to satisfy and extinguish the unpaid balance due the government of the United States for the said land under the terms of the said sale to the said defendant; that as a part of said agreement, and to induce the plaintiff to undertake the task of securing a reduction of, or rebate upon, the payment required to be made, as aforesaid, for the said land to the government of the United States, the defendant at said time orally agreed with, and promised to the plaintiff to pay to the plaintiff a sum of money equal to ten per cent. of the reduction or rebate which the plaintiff might secure of or upon the amount due the government as aforesaid, and the plaintiff at said time, as a part of said agree-

ment, orally promised and agreed to and with the defendant to undertake to secure a rebate upon or reduction of the amount remaining to be paid to the government for the said land as aforesaid; that it was further at the said time orally agreed by and between the plaintiff and the defendant that the sum of money to be paid by the defendant to plaintiff, as aforesaid, should be due and payable from the defendant to the plaintiff as soon as the said reduction or rebate was secured, and the government of the United States accepted the reduced amount in full payment for said land."

It is apparent from reading the contract that it is valid on its face, and one that the parties had a right to make. It contains no agreement, in terms, to procure legislative action, and it is quite clear from the record that no such action was considered necessary, or was in any way contemplated, by the parties thereto at the time it was made. It appears that, after the plaintiff below had obtained the consent of the Indians to a reduction of the price of their lands, as contemplated by the agreement, and when such consent was presented by the plaintiff to the secretary of the interior for his approval, that officer was also of opinion that he had the power to make the necessary orders to close up the transaction, under the authority of the act of congress of March 3, 1893, referred to in our former opinion; and it would seem that, when the secretary had approved of the reduction sought by the plaintiff, and agreed to by the Indians, the plaintiff had performed, as far as he could, the services contemplated by the parties when the contract was made. That such an agreement was perfectly legitimate, and the services thus performed were proper, there can be no doubt. It is shown that it was the secretary of the interior that originated the idea that additional legislation should be had, giving him further power, before making his final order approving of the agreement of the parties and granting the rebate in question. He therefore, on his own motion, and without suggestion of the plaintiff, prepared a bill for that purpose,

and had it submitted to congress.  So it may be said that
when, as stated in the contract, it was agreed that the
plaintiff should take such action and render such services
as in his judgment might be necessary and proper to secure
such rebate from the government and the said Indians, it
was not within the mind of either of the parties that legis-
lative action would be required, and services of that kind
were not intended to be contracted for.

In *Richardson v. Scott's Bluff County, supra,* the con-
tract was:  "To draft a bill, have it introduced in the
legislature, explain it to and make arguments in its favor
before committees of the legislature, and do all things
needful and proper to secure its passage; such party to
receive no compensation unless the passage of the bill, an
appropriation act, is procured—if successful, the fees not
fixed, but to be liberal."  By a comparison of the contracts
it clearly appears that they are not in the same class; that
one is a legitimate contract for professional services,
where legislative action is not contemplated or contracted
for, while the other is an agreement to procure legislative
action, to wit, the passage of an appropriation bill, by
drafting the bill itself, having it introduced in the legisla-
ture, and doing all things necessary, including lobbying,
to procure its passage.  That such an agreement is a
lobbying contract, is against public policy, and falls within
the rule announced by the courts in the cases relied on
by counsel for the defendant, there can be no doubt.

In order to dispose of the whole question, it only re-
mains for us to consider the nature of the services per-
formed by the plaintiff in carrying out his part of the
agreement.  It is insisted by counsel for the defendant
that such services were illegal, opposed to considerations
of public policy, and were void; that plaintiff cannot re-
cover for such services, and by their performance the con-
tract is brought within the rule last above stated.  We are
unable to give our assent to this view of the matter.  It
appears that the services performed by the plaintiff up
to and including the time when he had secured the ap-

proval of the secretary of the interior to the agreement of the Indians granting a rebate or reduction of the price of the land in question were strictly legitimate and proper, and were such professional services as were evidently contemplated by the contract. It further appears that it was the secretary of the interior who first suggested a desire on his part for additional legislative authority before completing the transaction. The plaintiff did not frame the bill which was presented to congress, it was drawn by the secretary of the interior, who also procured it to be introduced before both houses of congress. It appears, however, that thereafter the plaintiff was called, or at least appeared, before a committee of each house, and explained the nature of the bill, and informed them of its purpose and effect. This service he performed in a proper manner, and it is not shown that he influenced, or attempted to influence, any member of congress in order to secure the passage of the bill. The services thus performed by the plaintiff, it would seem, were purely professional in their nature, and fall within the rule announced in *Trist v. Child,* 21 Wall. (U. S.) 441. They are within the category of preparing and presenting arguments, and submitting them to a legislative committee or other proper authority. And if the contract contained an express agreement to perform such services for a contingent fee, such agreement would not render it void. So we are of opinion that the conclusion announced by our former decision is right, but that the expression that the contract herein falls fully within the case of *Richardson v. Scott's Bluff County* should be, and it is hereby, disapproved. We are satisfied, however, with our modification of the rule in that case, and again give it our approval.

For the foregoing reasons, our former opinion is adhered to.

AFFIRMED.