## Gordon v. Gordon's Administrator.

(Decided February 10, 1916.)

### Appeal from Boyle Circuit Court.

1. Contracts—Contracts Prohibited by Law.—There are many acts which the law positively forbids, and for the doing of which some penalty is attached; and, any agreement which involves the doing of an act which is positively prohibited by the rules of the common law, or by statute, is illegal, and void.

2. Contracts—Public Policy.—There are many things which the law does not prohibit, in the sense of attaching penalties, but which are so mischievous in their nature and tendency, that on grounds of public policy, they cannot be admitted as the subject of a valid contract.

3. Contracts—When Against Public Policy.—A contract is against public policy if it is injurious to the interest of the public, or contravenes some established interest of society, or if it contravenes some public statute, or is against good morals, or tends to interfere with the public welfare.

4. Contracts—Public Policy.—The rule that contracts against public policy will not be enforced, must not be understood to mean that in order that a contract may be declared to be against public policy, it must be inimical to morality; many contracts which are not immoral, are, nevertheless, void on the ground that they are against public policy.

5. Contracts—Void Contracts—Section 1370 Ky. Stats.—Under section 1370 of the Kentucky Statutes, a contract to aid or assist

in procuring a pardon from the Governor, for fee or reward, is void.

6. Contracts—Application for Parole—Preparation of Parole—Contract as to Enforceable.—A contract to reimburse one for his expenses in preparing an application to the State Board of Prison Commissioners for a parole under section 3828 of the Kentucky Statutes, and to obtain the necessary facts and information required by the statute to support the petition for a parole, is neither forbidden by section 1370 of the Kentucky Statutes nor against public policy, and is enforceable.

JAY W. HARLAN and HENRY JACKSON for appellant.

J. W. RAWLINGS for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE MILLER— Reversing.

The appellant, Wm. M. Gordon, is a son of J. L. Gordon, who died in January, 1914. J. L. Gordon was the father of another son, George Gordon, who was confined in the State penitentiary, at Frankfort, in 1909, under a judgment of the Boyle circuit court.

The petition alleges that in 1909 J. L. Gordon employed the appellant to prepare an application and to do what was necessary toward securing the parole of said George Gordon, and agreed and promised to reimburse and pay plaintiff for all the expense that he might incur in that work; that pursuant to said employment, the plaintiff prepared the application for the parole; and, in doing so made many trips to Frankfort, Danville, Harrodsburg and over the entire county of Boyle, at his own expense.

The petition further alleges that by reason of the plaintiff being required to be absent from home in this work, he was forced to hire a man to work in his place on his farm; that the time consumed in this work and effort to get the parole was the greater part of five years; that he was required to pay for said substituted hand at least $1,000.00; and that his father agreed to pay the plaintiff his expenses, including the hire of the substituted hand.

The plaintiff also alleges that no unlawful means were used by him in said employment and none were contemplated at the time of the agreement; that said services so rendered were purely ministerial; that he did not use his personal influence with the paroling powers, and that it was never contemplated that he should do so.

It is further alleged that the agreement did not contemplate and did not include any reward or compensation to plaintiff whatever, but only included and provided for the plaintiff having returned to him his expenses, as above indicated; and that J. L. Gordon, by reason of his age and physical condition, was unable to personally make said trips in the preparation of said petition for a parole.

Upon the death of J. L. Gordon, his son, J. T. Gordon, qualified as his administrator; and, J. T. Gordon having subsequently died, George Gordon was appointed administrator of his father's estate.

In December, 1914, Wm. M. Gordon brought this action to recover his expenses aggregating $1,000.00, and the court having sustained a demurrer to his petition, upon the ground that the contract was against public policy and void, the plaintiff prosecutes this appeal.

By way of defense, the administrator relies upon section 1370 of the Kentucky Statutes, which reads as follows:

"If any person shall, for fee or reward, or the promise thereof, aid or assist in procuring the Governor to grant or refuse a pardon, remission or respite of any punishment or fine, he shall be fined not less than twenty nor more than five hundred dollars."

Appellant, however, denies the applicability of the statute, *supra,* or the doctrine that the contract relied on is against public policy, because, as he contends, (1) the work performed by the plaintiff was to secure a parole, and not a pardon; (2) it was clerical or ministerial, and under the contract the plaintiff was not to be paid for his personal influence; and, (3) the money sought to be recovered is not a reward, remuneration or profit to the plaintiff for his personal services, but is only for money expended and pecuniary loss suffered by reason of expenses and time lost from his own business, by reason of the contract.

It is contended by appellant that there is a radical difference between a contract to procure a pardon from the Governor, which is denounced by the statute, and a contract to prepare an application to the Board of Prison Commissioners, for a parole; that a contract to procure a parole is in no respect against public policy; and, that the reason which makes a contract to procure a pardon

invalid has no application whatever to a contract to prepare and present an application for a parole.

Since the enactment of section 1370 of the Kentucky Statutes, the power of parole has been vested in the State Board of Prison Commissioners, subject to the approval of the Governor. Ky. Sts., sec. 3828. By the terms of that statute, the Board of Prison Commissioners must base its action upon the record of the prisoner while confined; the record of his life previous to his confinement, which requires the ascertainment of the sentiment of the people where he formerly resided; and upon his securing, before his parole, a contract for some respectable employment for a period of six months after being liberated. Of course, much of this information can be furnished only through the efforts of some outside person in behalf of the man confined in the penitentiary.

Moreover, the parole does not pardon the prisoner; he still remains in the legal control and custody of the Board of Prison Commissioners. The pardoning power remains vested in the Governor.

It will thus be seen that the action of the paroling board must be based upon the facts specified in the statute, and that many of those facts necessarily must be gathered from outside sources.

There are many acts which the law positively forbids, and for the doing of which some penalty is attached. Whether the prohibition is by the common law or by statute is immaterial. Any agreement which involves the doing of an act which is positively prohibited by the rules of the common law or by statute, is illegal and void.

There are also many things which the law does not prohibit, in the sense of attaching penalties, but which are so mischievous in their nature and tendency that on grounds of public policy, they cannot be admitted as the subject of a valid contract.

It is probable that a satisfactory or precise definition of public policy has never been given. The courts have, however, frequently approved Lord Brougham's definition of public policy, as the principle which declares that no one can lawfully do that which has a tendency to be injurious to the public welfare.

But the notion as to what is injurious to the public welfare at one time may not accord with the notion of a succeeding generation. Public policy, therefore, is vari-

able; and that which is contrary to the policy of the public at one time may become public policy at another time. No hard and fast rule can be given by which to determine what is public policy.

It has been said that a contract is against public policy if it is injurious to the interests of the public, or contravenes some established interest of society, or if it contravenes some public statute, or is against good morals, or tends to interfere with the public welfare or safety, or, as it is sometimes put, if it is at war with the interests of society, and is in conflict with the morals of the time. Pueblo R. R. Co. v. Taylor, 6 Colo., 1, 45 Am. Rep., 512; McNamara v. Gargett, 68 Mich., 454, 13 Am. St. Rep., 355.

The rule must not be understood to mean that in order that a contract may be declared to be against public policy, it must be inimical to morality. Many contracts which are not immoral, are, nevertheless, void on the ground that they are against public policy. Kohn v. Melcher, 43 Fed., 641, 10 L. R. A., 439.

In applying this rule, it has been said that contracts are against public policy when they tend to injustice or oppression, restraint of liberty, and natural or legal right, or the obstruction of justice, or the violation of a statute, or to interfere with or control executive, legislative, or other official action, or to prevent competition whenever a statute or any known rule of law requires it.

In many jurisdictions statutes have been passed similar to section 1370 of the Kentucky Statutes, denouncing as unlawful, contracts to procure a pardon from the Governor; and, if the contract in the case at bar employed the appellant, for a fee or reward, to procure a pardon from the Governor, it would be against the public policy of the State, and consequently void.

The reason for the rule, and the exceptions thereto, are stated in 9 Cyc., 493, as follows:

"The exercise of the pardoning power committed to the executive should be as free from any improper bias or influence as the trial of the convict before the court; consequently the law will not enforce a contract to pay money for soliciting petitions, signing petitions, using influence to obtain a pardon, or the remission of a forfeiture. But as in the case of lobbying contracts many courts have held that the reason for holding such agreements void fails when no unlawful means of attaining the desired object are contemplated by the contract itself

or in fact employed; and such services, when performed at defendant's request, are a good consideration for a subsequent promise to pay. Such agreements would clearly seem to be lawful, where the services contracted for are publicly rendered by advocates disclosing their true relation to the subject, and not by private individuals keeping secret the character in which they solicit; but where the compensation is contingent on success, this is a strong circumstance against the validity of the agreement.''

In McGill's Admr. v. Burnett, 7 J. J. M., 640, a contract by which McGill's intestate agreed to pay Burnett $100.00 in consideration of his services and labor to be performed in and about the management of a petition to the Governor, in case of a certain forfeiture, this court said the contract was, in effect, to pay the plaintiff for his management, whether fair or foul, in inducing the Governor to remit a forfeiture, and that such contracts tended to obstruct a correct administration of the government, and were void as against public policy.

A similar ruling was made in Brown v. Young, 7 Ky. L. R., 664. See also Averbeck v. Hall, 14 Bush, 505, for a ruling similar in principle.

But, under the exception to the general rule, as above stated, the contract will not be held invalid when no unlawful means of attaining the desired object are contemplated by the contract itself, or in fact employed.

Thus, the general rule which makes contracts of this character void, does not apply in cases in which the party whose pardon is sought to be obtained, has not been convicted of crime by a legally constituted tribunal having the constitutional right to try and punish the offender, as where the trial of a prisoner by a military court is unauthorized by law, and forbidden by the constitution, and its sentence is, consequently, a nullity.

Where, under such circumstances, a person undertakes by the use of his personal influence with the military commander to save the unfortunate man from the impending danger of threatened execution, or unauthorized and illegal imprisonment, his act cannot be regarded as an agreement to obstruct the proper administration of the government, or to defeat the ends of public justice. 6 R. C. L., 767.

The reasons which sustain the general rule and the statute, *supra,* apply only in cases in which the party

whose pardon is sought to be obtained has been convicted of crime by a legally constituted tribunal, having the constitutional right to try and punish the offender.

Thus, in Thompson v. Wharton, 7 Bush, 563, 3 Am. Rep., 306, Solon Thompson was arrested in 1865 by the federal military authorities. In the following June he was tried by a military court upon the charge of being a guerrilla, and was convicted and sentenced to suffer death. Wharton, a Louisville lawyer, had been employed prior to the trial to defend Thompson, for an agreed fee; and, on the day fixed for Thompson's execution, a new contract was made with Wharton, he agreeing, by proper proceedings before the commanding general, without whose approval the sentence of the military court could not be carried into execution, to prevent the infliction of the adjudged punishment; and, if possible, to procure the discharge of Thompson, in consideration of a further fee of $300.00, to be paid only in event of his success.

In March, 1866, Thompson was discharged from custody, and Wharton sued to collect his fee. Upon the trial the court was asked to instruct the jury that if they believed from the evidence that the sole consideration for the execution of the note sued on was the agreement of Wharton to use his personal influence with the commanding general to secure the pardon of Thompson, or to have his punishment commuted, the agreement was contrary to public policy, and void.

But the court, speaking through Judge Lindsay, cited McGill's Admr. v. Burnett, *supra,* and held that the rule there announced did not apply, and should not control in cases where the conviction was unauthorized by law, and forbidden by the Constitution, as in Thompson's case.

In the course of the opinion, Judge Lindsay said:

"Under these circumstances the appellee undertook, by the use of his personal influence with the military commander, to save the unfortunate man from the impending danger of threatened execution or unauthorized and illegal imprisonment. Such an act can not be regarded as an agreement to obstruct the proper administration of the government nor to defeat the ends of public justice.

"The object sought to be accomplished, as well as the means to be resorted to, were entirely defensible, whether regarded from a legal or moral standpoint; and,

such being the case, it is difficult to perceive how the contract constituting the consideration of the note can be regarded as contravening public policy."

Again, in Rau & Rieke v. Boyle & Boyle, 5 Bush, 254, Rau & Rieke, who were Confederate sympathizers, had purchased a quantity of tobacco in western Kentucky which had been seized by General Payne, the federal military commander, at Paducah, under pretense of military authority. While their tobacco was thus wrongfully withheld from them, Rau & Rieke made a written contract with John Boyle, by which the latter undertook to procure the release of the tobacco, Boyle to have one-half of it for his services.

By a subsequent contract with John and J. T. Boyle, Rau & Rieke were to buy tobacco and cotton on speculation and ship the same under a permit then held by Boyle from Major General Burbridge, of the U. S. Army, or under other permits which he might thereafter obtain, and the profits realized from said purchases were to be equally divided between Rau & Rieke and the Boyles. Boyle succeeded in procuring the release of the tobacco which had been seized by General Payne, and other tobacco was bought and shipped under the second contract, above referred to. The Boyles were Union men and had held positions in the U. S. Army, which they resigned before John Boyle undertook this agency to get the tobacco released.

In answer to the suit of Boyle & Boyle upon the contracts, Rau & Rieke contended that their agreements with Boyle & Boyle were mere promises to pay them for their loyalty, and for the exercise of their influence with officers of the United States Government, and consequently were illegal as against public policy.

But the court overruled this defense, holding that since Rau & Rieke had been unlawfully deprived of their tobacco, and their only remedy seemed to be the use of moral means, the court could not say that the employment of Boyle & Boyle to effectuate the purpose was either contrary to law or against public policy.

It will thus be seen that the strict rule of the statute has not been applied by this court in similar cases when the reason for the rule has ceased to exist.

Furthermore, the case before us does not come within the scope of the statute; and it has none of the features which would render it immoral, or against public policy.

The contract sued on was for the procurement of a parole, not a pardon; it is for reimbursement of expenses incurred, not for a fee or compensation; and the petition expressly states that the contract did not contemplate the use of any personal influence with any officers of the State in procuring the parole.

While we would uphold the integrity of the statute wherever it is applicable, under the authorities cited there is nothing in the contract before us which violates any rule of public policy. Deering & Co. v. Cunningham, 63 Kan., 174, 45 L. R. A., 410; Chadwick v. Knox, 31 N. H., 226, 64 Am. Dec., 329; Moyer v. Cantieny, 41 Minn., 242; Stroemer v. Van Orsdel, 74 Neb., 132, 4 L. R. A. (N. S.), 212, 121 A. S. R., 713; Denison v. Crawford County, 48 Iowa, 211; Hunt v. Test, 8 Ala., 713, 42 Am. Dec., 659; Trist v. Child, 21 Wall., 441, and Wright v. Tebbitts, 91 U. S., 252, contain interesting and valuable discussions of the question, and support the conclusion here reached.

The plaintiff might have been required, upon motion, to file a bill of particulars, showing his claim in detail; but that defect in the petition did not go to the merits of the plaintiff's claim; and a bill of particulars may yet be required.

Judgment reversed, with instructions to overrule the demurrer to the petition, and for further proceedings.