No. 30,098.

ELON ROBLEY, *Appellee*, v. C. A. SMITH, C. M. CARMAN and EDWIN POTTS, *Appellants*.

(5 P. 2d 1083.)

Opinion filed December 12, 1931.

*W. N. Banks, O. L. O'Brien, Walter L. McVey, Thomas E. Wagstaff* and *Jay W. Scovel*, all of Independence, for the appellants.

*Joseph W. Moss*, of Independence, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover money. One of the defenses was the contract to pay the money was illegal. Plaintiff prevailed, and defendants appeal.

In 1921 the legislature passed an act authorizing cities and counties to erect military memorials. The purpose of a memorial was declared in section 1 of the act:

"That the various counties and cities of the state of Kansas are hereby authorized and empowered to vote bonds or incur indebtedness in the manner hereinafter prescribed for the erection of such memorials as may be petitioned for as suitable and proper to commemorate the valorous achievements of the citizens of the respective cities or counties who as soldiers, sailors and marines entered the service of the United States during the war with Mexico, the Indian wars, the war of the rebellion, the Spanish-American war, and the great world war from 1914 to 1919, including therein those devoted women of the corps of the Red Cross nurses attached to the service of the United States; and also those citizens of the county or municipality who enlisted in the military, naval or Red Cross service during the great world war from 1914 to 1919. Such memorial so petitioned for may consist of a building, monument, arch, or other structure, or improved highway, park or boulevard." (Laws 1921, ch. 256, § 1.)

The act provided that erection of a city memorial should be petitioned for by twenty-five per cent of the electors of the city, and the proposition should be carried at a special election by a majority vote. Erection of the memorial should be financed by a bond issue, or by a tax levy. Maintenance was provided for as follows:

"The expense of maintenance of said memorial shall be paid out of the general fund of the county or city, or in case the same shall not be sufficient, to be paid out of a special fund which may be created for which the counties or cities are authorized to make a levy of not more than one-tenth of one mill per annum." (§ 8.)

The management and control of a memorial building was committed to three trustees, appointed by the mayor for specified terms of office. The trustees were to serve without pay. No power was given to use a memorial building in any manner which would detract from the purpose of its erection, or for gain.

By 1923 enthusiasm had waned a little bit, it was becoming apparent some cities would have white elephants on their hands, thoughts of money, somewhere said to be the root of all evil, be-

came uppermost, and when the legislature met the maintenance provision of the law was modified as follows:

"*Provided,* That the board of trustees shall have the authority to lease all or any part of said building for hire to any person or persons desiring to lease the same and fix the rate and terms upon which the charge shall be made and collected therefor." (Laws 1923, ch. 213, § 1.)

Memorial building trustees turned to the picture-show business. Private owners of moving-picture theaters protested, there was some revulsion against turning patriotic memorials into revenue-producing agencies, and the legislature of 1925 struck out the proviso inserted in the act of 1923. The legislature of 1925 also provided that one trustee should be an ex-service man, and memorial buildings again became public patriotic memorials.

The city of Independence erected a memorial building. The trustees, as such, operated picture shows in the building—at a loss. The attorney-general enjoined the city and the trustees. The trustees as a board of trustees then leased the theater portion of the building to plaintiff in this case, and agreed as follows:

"First party agrees that second party shall have the use of said leased premises and the privilege of charging admission to the same for the purpose of giving public entertainments, including the exhibition of motion pictures and the presentation of theatrical acts of all kinds, . . ."

Plaintiff commenced to operate the building as "The Memorial Theater," and the attorney-general brought suit to enjoin him from so doing. The district court denied injunction, and the judgment of the district court was reversed by this court in the case of *State, ex rel., v. City of Independence,* 123 Kan. 766, 256 Pac. 799.

As a part of the arrangement with plaintiff the trustees as individuals agreed to finance plaintiff's operation of the building as a motion-picture house. Plaintiff lost $2,774.90, and this action was commenced to enforce the contract of the trustees, made in their private capacity, to finance the business conducted under the lease made by the trustees in their official capacity. The petition contained the following:

"That whereas, said above-named defendants in their capacity as said trustees of said Memorial hall had been enjoined, a copy of which order is hereto attached marked 'Ex. D,' by the court from further operating said Memorial hall in the conducting of picture shows, and other amusements, as such trustees; and whereas, on account of the large expense had in the commencing of such amusement business, money had been lost by them so far in such business; and whereas, they were of the opinion that if said business could be

further conducted such business would make enough money to overcome the losses so far sustained and make a profit; but that they could not further conduct such business as such trustees on account of said injunction. That their personal business reputation was at stake, and they desired their administration as such trustees of said Memorial hall to reflect their business ability and judgment and to show a profit at the end of their administration. That if this plaintiff would devote his time, experience and skill to the conducting of such picture shows and entertainments, and conduct such business in his own name, that they as such trustees of said Memorial hall could and would lease said Memorial hall to this plaintiff for the sum of two hundred and fifty dollars per month ($250), and as individuals they would finance said business enterprise and would pay all expenses and whatever bills might be contracted by this plaintiff in the conducting of such business, and in general would fully finance said business."

Plaintiff testified as follows:

"A. Mr. Smith says, 'Robley, you know that as a board of trustees we have been enjoined from continued operation of Memorial theater, that we have been at considerable expense in preparing to open and operate the theater up to this time, and we are very anxious to continue it, we feel that our personal reputation and our business judgment and reputation are at stake on it, we don't think we have had a just proposition with the injunction against us, we think we should continue to operate it, we are very anxious to operate it, we want to know if you will operate this show in your name.'

"Q. What did you say to that? A. I said, 'Mr. Smith, I haven't any money; I am not in a financial position to operate the picture show.'

"Q. What was then said to you, if anything? A. Mr. Smith says, 'Robley, that is all right, we are very anxious to continue this, and if you will consent to operate this in your name, we, as a board of trustees, will give you a lease on Memorial theater and the equipment and rooms necessary to operate a picture show,' and he says, that 'as individuals we will finance the operation of this theater, and we will protect you against any accounts, and pay whatever indebtedness incurred that is necessary to operate the theater; all we want is, out of the first profits we want enough to cover our indebtedness which we have incurred up to this time, which is about $750, or more, and you can have the rest of the profits.' I says, 'That is fine; it looks like a wonderful opportunity; I will be glad to do it under those conditions; I will continue to operate the theater.' "

We have here a palpable subterfuge, fully explained to plaintiff, under which the building was to be operated in violation of the injunction, to get back money the trustees had lost, and the attorney-general might well have proceeded for contempt instead of for injunction. In the case of *Beffendeau v. Brooks*, 28 Cal. 641, the syllabus reads:

"A bond given to a sheriff to indemnify him for any loss or damage he may sustain by selling property levied on by him by virtue of an execution in violation of an order enjoining its sale, is void, because an unlawful contract."

In the opinion it was said:

"The bond took effect from its delivery, and its legality is to be determined by reference to the state of things then existing. Though the undertaking disclosed no unlawful purpose on its face, still it is entirely manifest that it was given for the purpose of inducing the sheriff to violate an existing judicial order. Edmondson knew of the injunction and so did Brooks. . . .

"The character of the bond depends upon the character of the sale; and the sale was not merely a civil injury to Buffendeau, assuming that the judgment against him had been discharged in insolvency, but it involved a willful and apparently deliberate disobedience to public authority. . . ." (p. 644.)

The court might have added that the bond was given to induce breach of duty by a public officer, and the books are full of cases holding such contracts are void as against public policy. In this instance the illegality is emphasized by the fact that the public officers were themselves the moving parties.

Aside from the injunction feature of the case the whole enterprise was illegal. While the statute contained no express prohibition against leasing, the amendment striking out express authority to lease manifested legislative intention that memorial buildings should not be leased, as clearly as if there had been express prohibition. To grant power and then to revoke the grant is equivalent to declaration the power shall not be exercised.

The statute contained no penalty for leasing contrary to law. The trustees were, however, public officers, holding offices of public trust. Their conduct constituted misconduct and abuse of authority in official capacity, willfully and wrongfully displayed in disregard of the obligations owed to the public, and they were guilty of misdemeanors under R. S. 21-807, as interpreted in the case of *State v. Dixon*, 80 Kan. 650, 103 Pac. 130.

Whether the transaction was moral or immoral need not be discussed.

"There are many acts which the law positively forbids, and for the doing of which some penalty is attached; and any agreement which involved the doing of an act which is positively prohibited by the rules of the common law, or by statute, is illegal and void.

"There are many things which the law does not prohibit, in the sense of attaching penalties, but which are so mischievous in their nature and tendency that on grounds of public policy they cannot be admitted as the subject of a valid contract.

"A contract is against public policy if it is injurious to the interest of the public, or contravenes some established interest of society, or if it contravenes some public statute, or is against good morals, or tends to interfere with the public welfare.

"The rule that contracts against public policy will not be enforced must not be understood to mean that in order that a contract may be declared to be against public policy it must be inimical to morality; many contracts which are not immoral are, nevertheless, void on the ground that they are against public policy." (*Gordon v. Gordon's Admr.*, 168 Ky. 409, syl. ¶¶ 1, 2, 3, 4.)

The contract involved did not merely have a tendency to promote disobedience of public authority and induce disregard of official duty. It was designedly made to defeat exercise of public authority and effect a breach of public trust. The agreement to finance operation of the theater under the lease was an integral part of the scheme. Plaintiff was *in pari delicto*. There are no overriding equities in his favor, and the law leaves him where it finds him.

Plaintiff discusses some procedural matters. When plaintiff gave the testimony quoted above the court should have dismissed the action on its own motion.

The judgment of the district court is reversed, and the cause is remanded with direction to dismiss the action.