[No. 14268.  Department Two.  January 31, 1918.]

NORTHWESTERN IMPROVEMENT COMPANY, *Appellant*, v.
H. G. McNEIL *et al.*, *Respondents*.[1]

COUNTIES — COUNTY BOARD — AUTHORITY — CONTRACTS — EMPLOYMENT OF VALUATION EXPERT. Under Rem. Code, § 3890, subd. 6, giving the county board the care and management of county business and such other business "as may be conferred by law," the county commissioners have no power to employ experts to locate coal lands "for tax assessment purposes;" in view of Id., §§ 9102½, 9105, 9129, 9130, giving the county assessor and deputies appointed by him full power to make all due inquiry upon valuations for assessment, there being no intent to divide the duty or give the county board supervisory powers.

Appeal from a judgment of the superior court for Kittitas county, Davidson, J., entered June 16, 1917, upon sustaining demurrers to the complaint, dismissing an action for an injunction, tried to the court. Reversed.

*Geo. T. Reid, J. W. Quick, L. B. da Ponte,* and *C. A. Murray,* for appellant.

*Arthur McGuire, H. G. Rowland, Dix Rowland,* and *Harry E. Phelps,* for respondents.

CHADWICK, J.—This action was brought by appellant to enjoin the performance of a contract entered into

[1]Reported in 170 Pac. 338.

between one Raymond P. Tarr and the county of Kittitas. The contract is as follows:

"This agreement made and executed in duplicate this 5th day of April, 1917, by and between Kittitas county, Washington, thru its board of county commissioners, first party, and Raymond P. Tarr, second party, Witnesseth:

"The second party agrees, at his own expense, to make a complete and accurate expert geological investigation and examination of the lands of Kittitas county, Washington, for the purpose of locating all the coal lands therein *for tax assessment purposes,* and to list all improvements and appliances provided for or used in mining for coal in said county, and to make and file in the office of the assessor of Kittitas county, Washington, in triplicate maps and written report, giving geological data and coal *values in practical form and detail for assessment purposes,* by forty-acre tracts according to governmental subdivisions, of all lands in said Kittitas county, Washington, carrying commercial coal in such quantity *as to make them valuable for general taxation purposes,* and to make and give, upon demand, such additional report, data or information in connection therewith, as may be demanded by first party, said investigation to be completed and *all maps and reports to be filed with said county assessor* by the 15th day of July, 1917.

"That first party agrees to pay to second party therefor the sum of three thousand five hundred dollars ($3,500), as follows, to wit:

"$500 upon presentation and approval of the bond herein provided for.

"$1,000 on June 1st, 1917, upon filing by second party of data at that date acquired.

"$1,000 upon filing completed maps and reports as herein provided.

"$1,000 on January 1st, 1918.

"It is further understood and agreed *that second party shall furnish* on demand, as often as demanded, to the first party or to the prosecuting attorney for Kittitas county, Washington, *all necessary data for evidence, together with the personal testimony of sec-*

*ond party,* together with such assistance, expert counsel and advice, and all information in possession of second party, necessary, expedient or valuable, *in sustaining the valuations* so made by second party, *in event of any suit or action involving the valuation for taxation purpose, of said lands so valued by second party for coal.*

"That if said data, testimony, assistance, counsel, advice or information is demanded by first party or said prosecuting attorney prior to January 1st, 1919, second party shall receive no compensation in addition to said sum of three thousand five hundred dollars ($3,500), excepting that said second party shall receive from first party, his actual expenses necessarily expended in so furnishing the same; but if any of the said data, testimony, assistance, counsel, advice or information, is demanded by first party of said prosecuting attorney, after January 1st, 1919, then for each day actually occupied by second party in furnishing the same, the first party shall pay to second party, the sum of fifty dollars ($50) for each day necessarily occupied in furnishing the same, together with his actual expenses necessarily expended in so doing: Provided that if, after January 1st, 1919, at the time of any such demand by first party or said prosecuting attorney, the said second party be then under contract at stipulated compensation, with first party, for the valuation, revaluation, or checking of lands or of coal values of lands, in Kittitas county, Washington, no compensation additional to said compensation as stipulated in said contract, shall be paid to second party for the furnishing of said data, testimony, assistance, counsel, advice or information, excepting that second party shall receive from first party, his actual expenses necessarily expended in furnishing the same.

"It is further understood that second party shall furnish to first party, to the approval of first party, a bond in the sum of three thousand five hundred dollars ($3,500) conditioned for the faithful performance of this contract, and for the protection of first party from, and the payment of, all liens or claims of every character for labor or material used or indebtedness

incurred in the performance of this contract by second party, first party to pay premium on said bond if approved.

"This contract shall not be in force until the approval of said bond by first party.

"In witness whereof, the parties hereto have hereunto set their hands in execution hereof, this 5th day of April, 1917.                    H. G. McNeil
                                "James Lane
                                "J. W. German
    "Board of county commissioners of Kittitas county, Washington, first party.      Raymond P. Tarr,
                                "second party."

In some of the counties of this state, boards of county commissioners have entered into contracts with some one claiming to be expert in the measuring and valuing of timber and coal land, to the end that the value of the property may be better understood by the taxing officers. After the contract with Mr. Tarr had been entered into, Tarr asked to be, and was, appointed a deputy assessor of Kittitas county.

It is now conceded that the assessor had no right to appoint Tarr, who is a nonresident (Rem. Code, § 3973), and his right to proceed in the performance of his contract is not rested upon that ground. Counsel insists, however, that the county commissioners may, under their general powers, employ an expert to measure and determine the extent and value of property that is to be listed for taxation. The contention of the appellant is that the commissioners have no such general powers, and if so, the contract of Tarr is such that it should be overturned upon the ground of public policy.

The power of the board of county commissioners to make such a contract has been passed upon in the Federal district court for the western district of Washington, southern division, and the Federal district court

of Idaho. Judge Neterer upheld a similar contract in *Pacific Timber Cruising Co. v. Clark County,* 233 Fed. 540, finding warrant for his holding in the general powers of the commissioners, Rem. Code, § 3890, subd. 6, and in the fact that the commissioners sit as a board of equalization, Rem. Code, §§ 9200-9207. Judge Dietrich, having a similar contract, and a statute to all intents and purposes the same as our own, held the contract to be *ultra vires.*

It must be admitted that the law, in so far as we find it in existing statutes, and as it may be gathered from a consideration of our political system as it is revealed in the constitution, proceeds upon the theory that the county assessor is a competent and qualified person to make assessments upon any and all kinds of property, either by his own act, or through the instrumentality of competent persons whom the law gives him a right to select and qualify as deputies. It may also be admitted that, with the development of the resources of our state, undeveloped coal and timber lands have become of great value; that the average man is not qualified to fix a value upon property where such valuation rests in expert opinion, and that such expert opinion cannot be obtained at a cost equal to a deputy's salary.

The office of county assessor is created by law, Rem. Code, § 3971. The duties of the assessor are not defined specifically in the act creating the office, but generally in the chapter devoted to the subject of taxation, Rem. Code, title LXXVI. The assessor is enjoined to, and makes undertaking that he will "diligently, faithfully and impartially perform the duties enjoined on him by law," Rem. Code, § 3972, and when he "deems it necessary to enable him to complete the listing and valuation of the property of the county within the time prescribed by law, may appoint one or more well-qualified citizens of his county to act as his assistants

or deputies.'' The deputies are required to make oath that they will ''perform all the duties enjoined upon, vested in or imposed upon assessors.'' Rem. Code, § 3933. The assessor and his deputies are given full power to administer oaths, and to make all due inquiry to lead to a proper understanding of the value of property of every kind. Rem. Code, §§ 9102½, 9105, 9129, 9130. Whatever may be the fault of the system, it is certain that it was adopted by the legislature as a complete and supposedly ample system, and with no intent of dividing the duty imposed upon the assessor with the board of county commissioners, or of granting the commissioners a supervisory control over the assessor.

It is not contended that the county commissioners have been given any express authority to employ experts to value property for the purposes of taxation, but it is insisted that the board, irrespective of any specific grant of power, has a general power, as the business and fiscal agents of the county, to make such a contract. The general powers of the commissioners have been outlined by the legislature. The only part of the statute upon which any argument can be advanced is subdivision 6 of § 3890 of Remington's Code. ''The board shall  .  .  .  have the care of the county property and the management of the county funds and business  .  .  .  and [have] such other powers as are or may be conferred by law.'' Under this section of the statute, the power of the board to make a contract with a private party to pay five per cent for making a list of all the delinquent taxes in the county was sustained. *Martin v. Whitman County,* 1 Wash. 533, 20 Pac. 599. The employment of an expert alienist to assist the prosecuting attorney in a criminal case was upheld. *Williams v. Snohomish County,* 64 Wash. 233, 116 Pac. 675. On the other hand, it has been held that

the commissioners could not, under their general powers, enter into a contract with a private party for the installation of an improved modern index for the county auditor's office. *Smith v. Lamping,* 27 Wash. 624, 68 Pac. 195. The employment of a stenographer to attend upon sessions of a grand jury has been discountenanced as not within the general powers of the board. *Mather v. King County,* 39 Wash. 693, 82 Pac. 121. Although it may seem to be so, there is no disharmony in these decisions. They are logical in themselves and consistent with each other. The only general power the board can exercise is in the management of the county funds and the county business. All other powers which may be exercised are such "as are, or may be, defined by law." The term "defined by law" needs no definition or construction. Its meaning is evident; it is not inclusive of power, but exclusive of all power unless defined by statute, except as to all matters that may be said to pertain to county funds and business and which are not delegated to others.

Boards of county commissioners are creatures of the statute. They must pursue and exercise the powers conferred upon them in strict compliance with the statute. *Green v. Okanogan County,* 60 Wash. 309, 111 Pac. 226, 114 Pac. 457; *Osborne, Tremper & Co. v. King County,* 76 Wash. 277, 136 Pac. 138. That the expert valuation of property does not pertain to county funds or county business within the meaning of the statute is evident, for not only is the power of the commissioners to obtain such valuations not granted by any express provision of the law, but the duty of valuing property is put by positive, independent statute upon the county assessor. Neither is there any statute giving power to the commissioners to furnish information to the assessor, nor does any statute

bind the assessor to follow the advice of the board, or any of its agents, if any advice is offered. The line of cleavage between the cases is clear. In the *Martin* case, it is said: "They . . . have no power to interfere with the several county officers in the discharge of their respective duties;" and in the *Williams* case, it is said:

"Our attention is called to *Smith v. Lamping,* 27 Wash. 624, 68 Pac. 185; *Mather v. King County,* 39 Wash. 693, 82 Pac. 121, and *McElwain v. Abraham,* 58 Wash. 26, 107 Pac. 832, to support the county's contention; but a reading of these cases will show that in each one the commissioners were attempting to provide something at the county's expense in addition to that which the law had specially provided for in the particular matter involved."

In the *Lamping* case, the authority to contract was denied because "the duty of making [the indices] devolves upon the county auditor," and because the law had "provided the manner and method of making and keeping the indexes to the county records." In the *Mather* case, the power to employ a stenographer was denied because "the duties, powers and offices of a grand jury are specifically defined by statute," the logic of this decision being that the county commissioners cannot exercise authority over, or become party to, the conduct of the business of other officers or bodies having duties and powers defined by law. It is thus made plain by our own decisions that the general powers of the commissioners do not give them the right of control over other county officers having definite powers and duties, nor in any case unless the business to be done can be referred to some express power, or some necessary implication arising out of an express grant of power. Clearly the power to appoint a deputy assessor, or to furnish the assessor with expert information, is not within the general powers of

the board, and the duty to value property for assessment purposes being put upon another officer, it follows that it is not within the implied powers. The case is not unlike *Snohomish County Abstract Co. v. Anderson,* 9 Wash. 349, 37 Pac. 471. An action was brought against the board of county commissioners to recover for the use of its abstracts in the preparation of an assessment roll. The assessor, feeling a need of the information to be obtained from the abstract books, entered into an agreement with the company after the commissioners had refused to make a contract. The court mentions this fact, but it really held that the board would have had no power to make a contract. It is said:

"Even if the commissioners would have been authorized to procure said books for such purpose . . . The use of a horse might have been necessary to enable the assessor to travel around more speedily, or within the time required, and the assessor unaided might have been unable to procure one, yet it would scarcely be contended that this would afford ground sufficient to authorize the commissioners to provide one, or to base a charge upon against the county if the commissioners should refuse to, and yet such charge could be sustained if the one in this action could be, for they stand upon the same ground."

It is urged that, because the board of county commissioners sit as members of the board of equalization, it has power to seek such information as would be obtained under the contract in order to fairly judge the value of property. The answer to this is that the board of county commissioners, as such, is not an assessment body. It is not a board of equalization. It is in no way connected with, nor is it in theory interested in, the assessment of property; that is a business put by law upon another and wholly independent board. It is true that the members of the board of

county commissioners sit with other officers — the county assessor and the county treasurer — and with them make up a board of equalization, Rem. Code, § 9200; but it is an independent body having duties and privileges specifically defined by law (Id., § 9207). The board has no power to subpoena witnesses or gather testimony at the expense of the county.

It is here that we think Judge Neterer's opinion is at fault. It seems to us that he has failed to notice that the board of equalization is a quasi-judicial body having no administrative powers independent of the act creating it. We may grant that, in a given case, the assessor is incompetent to fix values, and that the commissioners, when called upon to sit with the board of equalization, cannot intelligently perform their duties, but this furnishes no legal reason for contracting away a duty which the law has imposed upon the presumption of their fitness. Such a situation may call for legislative action, or the election of others having the necessary qualifications; but the courts are powerless to afford a remedy without trenching the province of the legislative body. Neither necessity nor convenience give ground for the sanctioning of such a contract.

In the *Lamping* case, it is said:

"The new method may be more convenient and more in accordance with the enlightenment and enterprise of the times, but, until the legislature has authorized its adoption and conferred upon the county commissioners power to expend public money for that purpose, we think it must be held that it is beyond their power to so expend the county's funds."

It is further urged that no one is to be legally bound by the report of the expert; that it *may* be used in fixing or equalizing values, or it *may* be rejected entirely. If the reason for entering into the contract is that the county assessor is incompetent to fix values

upon coal lands and coal mines, and the individuals who make up the board of county commissioners are incompetent to equalize values when they sit as members of the board of equalization, the theory of counsel would seem to refute itself. For, if the assessor or the board of equalization are not to be bound, there can be no legal excuse for making the contract, for the commissioners and assessors ground their defense upon a plea of inability to fix values. Being so unable, it follows that they could not measure the report when made with any degree of accuracy or understanding. They could not tell whether it be a true valuation, or whether it be arbitrary, or one resting in ill-founded opinion. Their argument is further met by the terms of the contract, wherein they have sought to bind the other contracting party to defend his report by testimony if called as a witness. The legal effect of the contract must be determined by resort to the reasons prompting its execution. When so considered, it is obvious that, if the county is to receive value for its expenditure, the expert is really to become the assessing officer.

"It is not suggested by the plaintiff that the reports would constitute competent evidence in any statutory proceeding or judicial hearing. That being so, the board of equalization could not properly weigh them as against a proper showing made by a taxpayer in his effort to reduce or prevent the increase of a proposed valuation of his property. It would seem, therefore, that the reports could be legitimately used only for the purpose of suggesting the possible need of investigation; that is, if they differ materially from the valuations which the assessor has been or is placing upon certain lands, the discrepancy may justify the board of equalization in making an investigation for the purpose of ascertaining the facts. Thus indirectly the cruise, if found to be reasonably accurate, would be of some assistance to the commissioners in the per-

formance of their duties. But it is not thought that this indefinite benefit, small as compared with that of a cruise made through official channels, can be accepted as the basis upon which to rest the validity of the contract." *Dexter Horton Trust & Sav. Bank v. Clearwater County,* 235 Fed. 743, 750.

This reasoning would seem to be indisputable, for the contracting party is neither stimulated nor restrained by an oath such as is usually taken by public officials, or held to a fair and impartial performance of duty by a bond such as is usually given by those who have to deal with the affairs of the citizen.

In the final analysis, this case comes down to one question: Whether the county commissioners, however necessary a thing may seem to be, have the power to appoint a private individual to do a thing, or perform a duty, which the law imposes upon one of the regular county officers—one who is charged with the doing of the very thing sought to be accomplished by independent contract with a stranger to the county.

If this contract were to be upheld, the county commissioners might, by entering into one or many contracts, entirely usurp the powers of the county assessor and the functions of his office, on the theory that he or they were incompetent to make valuations on any one or all classes of property; or it would enable them, under the guise of their powers as members of the board of equalization, to gather information and fix values independent of the assessor. If they would have such power, they would have power to enter into a contract permitting the assessor and treasurer each to obtain an expert opinion and a valuation, so that each member of the board of equalization could act independently and upon his own advices. It would enable the board, if it conceived the notion that the assessor, being a farmer, had no personal knowledge of

the value of a mercantile business, to hire an expert for the valuation of all merchandise stocks; or, if the assessor be a merchant having no knowledge of the value of farm lands and live stock, to hire an expert to furnish it a list and valuation of such property; or, coming closer to the case at bar, if the assessor were a man having a practical and technical knowledge of coal lands and coal mines, being himself engaged in that business, the commissioners might, under the pretense of serving county funds and county business, and entertaining a belief that, having a direct interest, the assessor would not make a fair valuation, appoint an expert to furnish its members such valuation, upon which it might, irrespective of all discretion on the part of the assessor, make the assessment indirectly (the members of the board being a majority) through the board of equalization.

"Now, what reason can be assigned for ignoring this method, and, by resorting to the one here employed, depriving the taxpayers of the statutory right to be heard? Admittedly no sudden emergency had arisen. Assuming that a cruise was needed, why could it not as well have been made under the direction of the assessor, by qualified deputies appointed for that purpose? Possibly the assessor was not himself an experienced cruiser; but neither was Nease. Presumably, in appointing his deputies and clerks, the assessor selects persons qualified for the particular duties to which they are assigned. One man may be expert in the valuing of farm lands, and another may have had experience exclusively with the values of city property. The assessor in this particular case was an intelligent business man, a banker, and, so far as appears, was qualified to select competent clerical assistance, and experienced cruisers as deputies. There would thus have been no motive for slighting the work, and no occasion for conferences with large taxpayers as it progressed. And when it was completed the result would have had the sanction of law and a legal

status.  Whether it could or could not thus have been done more cheaply is perhaps immaterial to the present inquiry, but I have no doubt that a great saving could have been made.  And of what value will this contract cruise be to the county?  What use can be made of it?  Technically, it is true, it does not constitute an assessment, and in form it is therefore not obnoxious to the objection that it was unofficially made; but when we consider the substance rather than the form, does it not in effect constitute the assessment?  In order to sustain the validity of the warrants against attack upon a different ground, the plaintiff has uniformly contended, and now contends, that the cruise is indispensable to the assessor.  He cannot, so it is claimed, place a valuation upon the timbered lands without it; it is practically his only source of information.  If this be true, manifestly these unsworn, unofficial, nonresident cruisers have, in effect, if not in form, fixed the value of this vast acreage of timbered land for assessment purposes.  The assessor sits in his office, and, imputing verity to the information thus furnished him, values the land accordingly.  He can exercise no judgment or discretion, for by hypothesis his office knows no facts other than those disclosed by these reports.  The assessment comes to be a matter of making certain computations and entering the result thereof upon the assessment book, merely a clerical function.  Plainly, therefore, by this contract the interests both of the public and of the taxpayers were in effect committed to nonresident cruisers, unofficially employed, without official responsibility, and exempt from official direction or control.''  *Dexter Horton Trust & Sav. Bank v. Clearwater County, supra,* p. 749.

Our assessment laws are crude.  They are fashioned after forms obtaining when the problems which now beset us had not become acute, but they are the rules for our guidance; and the county commissioners, as well as this court, are bound by the law as it is.  The remedy for the wrong, if any, should be sought in the legislature, and not in contract with private parties.

The judgment of the lower court is reversed, with directions to overrule the demurrer to the complaint.

ELLIS, C. J., MOUNT, and HOLCOMB, JJ., concur.