[No. 21875. Department Two. August 13, 1929.]

THE STATE OF WASHINGTON, *on the Relation of Ward Hunt, Appellant,* v. OKANOGAN COUNTY *et al., Respondents.*[1]

[1]Reported in 280 Pac. 31.

*L. B. Donley, Wentz & Bailey,* and *Ward Hunt,* for appellant.

*H. A. Davis* and *Marion Edwards,* for respondents.

PARKER, J.—This is, in form, a statutory mandamus proceeding instituted in the superior court for Okan-

ogan county, wherein the relator, Ward Hunt, seeks a
judgment of the superior court for that county in the
form of a writ of mandate directing the commissioners
of the county to allow his claim of compensation for
services rendered to it, directing the issuance of a war-
rant therefor by the auditor of the county, when so
allowed, and directing the treasurer of the county to
pay such warrant, when so issued.

The claim of the relator against the county is for
services commenced and rendered to it by his assignor
in pursuance of his contract with the county and com-
pleted by relator in pursuance of an assignment of
that contract to him, with the approval of the county
commissioners, by which he succeeded to all of the
rights of his assignor and assumed all of the employ-
ment obligations of service contracted to be rendered
by his assignor.

The service in question, in brief, was the compila-
tion and preparation of a large amount of data and of
argument, and presentation thereof to the department
of the interior, and in turn to Congress, in support of
the claim of Okanogan county that it is equitably en-
titled to payment from the United States of a sum
equal to the amount of taxes legally chargeable by the
county, during the years 1901 to 1925, inclusive,
against allotted Indian lands within the county, had
such lands not been exempt by congress from taxation
during those years. Trial upon the merits as a civil
action in the superior court sitting without a jury, no
jury being demanded by either party, resulted in find-
ings and judgment denying to the relator any recovery,
from which he has appealed to this court.

In the year 1872, there was, by executive order of
the President of the United States, set apart as a reser-
vation for the Indians a large tract of land lying in the
northeasterly portion of the territory, now state, of

Washington. In the year 1888, Okanogan county was created by act of the legislature of the territory of Washington. A large portion of the lands so set aside as a reservation for the Indians lies within the boundary of Okanogan county so created and as existing territorially up to the present time. In June, 1892, an act of Congress was passed and became effective, reading, in so far as need be here noticed, as follows:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That subject to the reservations and allotment of lands in severalty to the individual members of the Indians of the Colville Reservation in the State of Washington herein provided for, all the following described tract or portion of said Colville Reservation, namely: . . . The same being a portion of the Colville Indian Reservation created by executive order dated July second, eighteen hundred and seventy-two, be, and is hereby, vacated and restored to the public domain, notwithstanding any executive order or other proceeding whereby the same was set apart as a reservation for any Indians or bands of Indians, and the same shall be open to settlement and entry by the proclamation of the President of the United States and shall be disposed of under the general laws applicable to the disposition of public lands in the State of Washington.

"Sec. 2. That the net proceeds arising from the sale and disposition of the lands to be so opened to entry and settlement shall be set apart in the Treasury of the United States for the time being, but subject to such future appropriation for public use as Congress may make, and that until so otherwise appropriated may be subject to expenditure by the Secretary of the Interior from time to time, in such amounts as he shall deem best, in the building of schoolhouses, the maintenance of schools for such Indians, for the payment of such part of the local taxation as may be properly applied to the lands allotted to such Indians, as he shall think fit, so long as such allotted lands shall be held in trust and exempt from taxation, and in such other ways

as he may deem proper for the promotion of education, civilization, and self-support among said Indians.

"Sec. 3. That each entryman under the homestead laws shall, within five years from the date of his original entry and before receiving a final certificate for the land covered by his entry, pay to the United States for the land so taken by him, in addition to fees provided by law, the sum of one dollar and fifty cents per acre, . . .

"Sec. 4. That each and every Indian now residing upon the portion of the Colville Indian Reservation hereby vacated and restored to the public domain, and who is so entitled to reside thereon, shall be entitled to select from said vacated portion eighty acres of land, which shall be allotted to each Indian in severalty. . . ." U. S. Stat. at Large, Vol. 27, 52nd Congress, Chapter 140.

Under the provisions of that act of Congress, some 220 allotments of land within the portion of the reservation so restored to the public domain were selected by and awarded to individual Indians in severalty, and accordingly by the United States conveyed to the several allottees, which conveyances were attended by such restrictions under this and other acts of Congress as prevented the county taxing authorities from levying taxes upon the lands so allotted and conveyed to the Indians, during the period here in question.

The opening to settlement by allotment to the Indians in severalty, and otherwise as provided by general laws to other citizens, caused that portion of the reservation to be brought under the jurisdiction of the local civil government of the state and county. This jurisdiction was then assumed by the county authorities, extending over that territory the usual benefits of civil government, such as police and court protection of all persons and property therein, including the persons and property of the Indian allottees, the building and maintaining of roads, the establishment

and maintenance of public schools, etc. This, it is plain, the county did, and has continued to do up to the present ·time, without receiving any tax contribution from the allotted Indian lands. This, in substance, constitutes the equitable and moral foundation of the county's claim against the United States.

Clair Hunt is a civil engineer of long experience, and he is also a man of extensive experience in Indian affairs, especially in the allotment of Indian lands in severalty and in his acquaintance with the laws of the United States relating thereto. In March, 1920, the commissioners of Okanogan county contemplated making a claim against the United States, through the department of the interior, and in turn to Congress, for an appropriation, if necessary, for payment to the county of money from the United States in lieu of taxes which would have been paid the county upon the allotted Indian lands in question had they not been exempt from taxation. Looking to that end, an employment contract was entered into between the county and Clair Hunt, reading, in so far as need be here noticed, as follows:

"THIS AGREEMENT, Made and entered into this 16th day of March, 1920, by and between Okanogan County, a municipal corporation of the State of Washington, acting by and through its· duly elected, qualified and acting Board of County Commissioners, the party of the first part, and Clair Hunt of Colville, Washington, the party of the second part. WITNESSETH: (Here follow whereas recitals setting forth facts inducing the making of the contract, in a large measure as already related.)

"Now, therefore, the said Okanogan County, party of the first part, acting by and through its duly qualified Board of County Commissioners in meeting assembled, for and in consideration of the promises and of the covenants and agreements of the party of the second part hereinafter contained, does hereby engage

and employ said party of the second part to act for and represent said Okanogan County in recovering or procuring of and from the United States Government reimbursement for the moneys expended as aforesaid in whole or in part, and in recovering and procuring from the said United States Government any and all moneys justly due or to become due Okanogan County on account of said allotted Indians, Indian lands, or in lieu of taxes on said allotted Indian lands, or any other sums so recovered on any account whatsoever by reason of such allotted lands.

"And the said party of the first part further promises and agrees to pay and compensate the said party of the second part for and on account of said services to be rendered by him as aforesaid fifty per cent of all moneys which may be recovered as reimbursement for years preceding 1926 by the said party of the second part or through or on account of his efforts whether said moneys are procured by appropriation of Congress or otherwise; and the party of the first part does hereby further agree that the party of the second part shall have all necessary aid and assistance of the officers and employees of the said Okanogan County in procuring the necessary data and information in furtherance of the objects of this agreement.

"And the party of the second part, for and in consideration of the covenants and agreements hereinbefore contained to be faithfully kept and performed by the party of the first part, hereby agrees to and does accept such employment and does covenant and agree that he will use his best efforts, and all knowledge and information which he has, in behalf of said party of the first part and in the prosecution of the claims of said County and in the accomplishment of the objects of this agreement; and the party of the second part agrees that he will pay all costs and expenses in the prosecution of said claims and that he will hold said County harmless on account of same, except that said county shall furnish the aid and assistance as provided in the preceding paragraph.

"IN WITNESS WHEREOF, The party of the first part has caused these presents to be executed by its duly authorized Board of Commissioners, and the party of

the second part has hereunto set his hand this day and year first above written.

"OKANOGAN COUNTY, WASHINGTON,

"By F. R. Hershberger

"F. E. Mitchell

"C. A. Teegarden

"Its Board of County Commissioners

"Clair Hunt, Second Party.

"The foregoing contract approved this 17 day of March, 1920.

"C. H. NEAL,

"Judge of the Superior Court of State of Washington, for Okanogan County."

On August 5, 1921, Clair Hunt assigned his interest in this contract to his son, Ward Hunt, this relator, a duly admitted and practicing attorney of this state. This assignment was in writing and duly approved by the county commissioners and the judge of the superior court. Relator thereby not only acquired all of the rights of Clair Hunt under the contract, but also assumed all of the employment duties specified in the contract.

Immediately following the entering into of the original contract, Clair Hunt, during the years 1920 and 1921, gathered and caused to be compiled a large amount of data necessary to the presentation of the claim of the county against the United States. Thereafter relator carried forward his employment under the contract, by performing services of the same character. On April 30, 1926, Mr. Hill, the representative in Congress from the congressional district of this state embracing within its boundaries Okanogan county, introduced in Congress a bill authorizing and directing the secretary of the interior to investigate and report to Congress as to the right of Okanogan county to be reimbursed for taxes it could have levied and collected as against the Indian allotted lands in question had they

not been exempt from taxation by Federal legislation. The record does not advise us as to whether or not this bill was introduced at the request of relator, but it is in any event apparent that Mr. Hill, knowing of the claim of Okanogan county, first brought the matter to the attention of Congress in this manner, to the end that it might be officially investigated and the right determined. This bill was referred to the congressional committee on Indian affairs. That committee, instead of reporting the bill back to Congress with recommendation, passed a resolution of the same import, requesting information from the secretary of the interior touching the rights of Okanogan county in the premises. Thus, the matter was brought to the attention of the secretary and of the bureau of Indian affairs.

Thereupon the secretary of the interior addressed a communication to the attorney general of the state of Washington, making a number of specific inquiries and asking reports thereon, to be signed officially by officers of Okanogan county, who could officially so certify by reason of their several official positions. The attorney general of the state thereupon referred the matter to relator, in response to which reference, relator, having already caused to be compiled the larger part of the information requested by the secretary of the interior, caused that and some additional information to be compiled, certified in appropriate official form, and transmitted to the attorney general of the state, who in turn transmitted it to the secretary of the interior, together with a formal claim of Okanogan county against the United States for the sum of $139,984.71, claimed as the amount of taxes the county would have lawfully charged and collected against the allotted Indian lands for the years 1901 to 1925, inclusive, had such lands been taxable. Soon thereafter, relator, in pursuance of his employment by Okanogan county, prepared and

presented to the secretary of the interior a typewritten brief and argument in support of the county's claim, based upon the data so furnished, and thereafter caused to be furnished to the secretary additional data bearing upon the question of the justness of the county's claim.

Thereafter, on December 16, 1927, Congressman Hill introduced in the house of representatives of Congress a bill authorizing the secretary of the interior to cause to be paid to Okanogan county the sum of $104,010.76, in satisfaction of the county's claim. This bill was referred to the house committee on Indian affairs, which committee thereafter, in February, 1928, reported, recommending amendment of the bill so as to allow Okanogan county only $77,435.31, and that, upon so being amended, it pass. Embodied in this report of the house committee on Indian affairs was a somewhat elaborate report from the secretary of the interior, addressed to that committee, in response to its resolution above noticed, reviewing the facts relied upon by the county in support of the justness of its claim against the United States, and in effect recommending an appropriation for the payment of $77,435.31, in full satisfaction of the claim of Okanogan county. In accordance with this report of the committee on Indian affairs and the report of the secretary of the interior embodied therein, the bill was passed as so amended, and approved by the President on April 23, 1928. On August 7, 1928, in pursuance of that act, there was paid by the United States to the treasurer of Okanogan county the sum of $77,435.31.

On August 8, 1928, the relator presented to the commissioners of Okanogan county his claim of compensation for having fully performed his contract of employment in successfully prosecuting the county's claim against the United States, to the extent of the county receiving from the United States the sum of $77,435.31;

claiming, as due him under his contract of employment and for his full performance of that contract, fifty per cent of that sum to wit, $38,717.65, as owing to him from the county. On September 5, 1928, the county commissioners rejected and disallowed relator's claim and refused to pay the same or any portion thereof. On November 9, 1928, within three months after the rejection and disallowance of relator's claim by the county commissioners, he commenced this proceeding, seeking recovery from the county as above noticed.

The trial court found that "the relator and his predecessor in interest in the contract, Clair Hunt, performed the contract;" and also found that

" . . . the relator and his predecessor, Clair Hunt, in the performance of the contract, employed no corrupt means, nor is there any evidence that either of them or any one for them resorted to any improper solicitation or influence to induce action by the Congress or any member thereof or by any official of the United States."

The evidence abundantly supports these findings.

Sometime prior to the date of the entering into of the original contract between the county and Clair Hunt, available funds from which the secretary of the interior might, in his discretion, pay to Okanogan county under section two of the act of 1892, above quoted, were otherwise appropriated. So thereafter there were no funds available which would be so payable in the discretion of the secretary of the Interior. Whether or not the county commissioners and Clair Hunt, at the time of the making of the contract, were aware of this fact, is not made plain by the evidence. It is to be noticed that the contract suggests the probable necessity of procuring payment of the county's claim by appropriation from Congress. The evidence, however, renders it plain that it was recognized from

the beginning that data and arguments in support of the county's claim would necessarily have to pass the scrutiny of the secretary of the interior and meet with approval from that source before there could be any hope of any allowance to the county, even by an appropriation from Congress. Hence, the efforts of the relator and his predecessor in interest in the employment contract were necessarily directed principally towards the preparation of data and placing the same in official form, duly certified by the appropriate officers of Okanogan county, and argument based thereon, to the secretary of the interior.

The decision of the trial judge, as evidenced by his memorandum opinion, is rested upon the theory that the employment contract of the county with Clair Hunt, which in turn became the employment contract of the county with the relator, is a contract for the rendering of services to influence legislation, that is, a lobbying contract, such as the courts hold to be void as against public policy. The learned trial judge seems to be of the opinion that a contract employing one to present facts and arguments to Congress or a legislature in support of a money claim against the government or state, though honestly believed by the claimant to be a just, moral obligation, is subject to condemnation and to be held void as against public policy, the same as so-called lobbying contracts are condemned and held void as being against public policy. Counsel for respondents argue, and the trial court in effect held, that three of our former decisions logically lead to this conclusion. We notice these in order.

In *State ex rel. Port of Seattle v. Superior Court,* 93 Wash. 267, 160 Pac. 755, L. R. A. 1917B 354, there was drawn in question the claimed authority of the commissioners of the port of Seattle, a municipal corpora-

tion, to expend funds of the port in aid of a referendum campaign looking to the defeat of the passage of an act of the legislature increasing the number of port commissioners and limiting the bonded indebtedness of such port districts. In that case, it was decided that the port commissioners had no such power of expenditure of the port's funds, the decision being rested upon want of any such express or implied power in the law of its creation, though some language of the opinion seems to recognize that such expenditure of the port funds would be against public policy. Judge Mount, speaking for the court, there said:

"We are of the opinion, therefore, that the Port of Seattle and its commissioners have not authority to expend the money of the corporation in an endeavor to defeat any law which has been passed by the legislature and referred to the people for approval or rejection. The approval or rejection of the amendment proposed to the Port of Seattle is a matter of no concern to the port itself, or its commissioners. As stated above, this corporation is a branch of the state government, municipal in its character, and its authority is limited to the powers expressly granted or necessarily inferred from express grants. If the port commissioners may take the money of the port, acquired by taxation upon property within the district or otherwise, for political purposes, or purposes other than those for which the port was organized, then there is no limit upon the port commissioners in expending the money of the port. The commissioners might determine that the best interests of the business of the port required that the individual members of the commission be perpetuated in office, and, because of that reason, use the funds of the port to insure their own election. We are clearly of the opinion that, when the port was created, no thought was held by any person that the money raised by the port could be used for political purposes, or any purpose other than for the direct use of the port and its business."

It thus becomes apparent that there was not in any sense drawn in question in that case the right and power of the port commissioners, as a question of public policy, to incur expense looking to the presentation and payment by direct legislative appropriation, of a claimed moral obligation owing by the state to the port.

In *State ex rel. Rice v. Bell,* 124 Wash. 647, 215 Pac. 326, there was drawn in question a claimed power of the directors of an irrigation district, a public corporation, to expend funds of the district in payment of the expenses of its employed engineer to attend the so-called "Western States Irrigation Congress" at San Francisco, to there work for and interest that gathering in a bill pending before Congress, the passage of which it was thought would be of benefit to the district. Our decision in that case, holding that the directors of the district did not possess any such power of expenditure of the district's funds, was rested upon the want of any such power, express or implied, in the law of the creation of the district. The nature of the bill pending before Congress, the passage of which it was thought by the directors of the district would be of benefit to the district, does not appear in that opinion, but by reference to the record of the case in this court it is rendered evident that the bill contemplated general legislation touching irrigation and irrigation districts, and had no reference to any accrued or accruing money claim of the district against the United States. So there was not in that case involved a seeking from the United States of payment of any money obligation, moral or legal, claimed as owing to the district.

In *Port of Seattle ex rel. Dunbar v. Lamping,* 135 Wash. 569, 238 Pac. 615, there was again drawn in question the claimed authority of the commissioners

of the port of Seattle to expend funds of the port in bringing about general legislation thought to be for the benefit of such ports. The question was again answered by us, in substance, as in our decision in *State ex rel. Port of Seattle v. Superior Court, supra.* Referring to that case we said:

"Practically every question here raised has been previously passed upon by this court in *State ex rel. Port of Seattle v. Superior Court,* 93 Wash. 267, 160 Pac. 755, L. R. A. 1917B 354, and the opinion in that case might be quoted *in extenso* as fully answering all of the respondent's contentions; . . .

"The only difference we can discover between the two cases is that in the former case the acts complained of consisted of attempts to educate, inform and influence the voters in passing upon a referred measure at a general election, while here the propaganda was directed (openly and without corrupt intent or motive, as found by the trial court) at the representatives of the people in legislature assembled; a distinction wholly without a difference, the principle being absolutely the same."

So there was not drawn in question in that case any claimed moral or legal debt owing by the state to the port.

We do not see in any of these three decisions any express view of the law militating against the lawfulness of a contract of employment of the nature here in question, which contemplated only a service by the employee consisting wholly of honorable and aboveboard preparation of data and argument and the presentation thereof to an administrative department of the government, and through such department to the government's legislative body, in support of a money claim honestly believed to be equitably due and to become due the county from the United States. True, the employment contract here in question contemplated the seeking of action by the legislative power, if necessary, but not a seeking of legislation of general char-

acter in which the public alone had a legitimate interest or benefit to be served. The service contemplated looked only to the presentation of data and argument in support of the county's accrued and accruing equitable claim, honestly believed by all concerned to be such, owing to it from the United States.

It is also true that the claim did not rest upon legal right, in the sense that the claimant could have properly sought relief with reference thereto as against the United States in its court of claims. Yet, manifestly, the county's claim had sufficient equitable and moral foundation to warrant its investigation and payment by direct action of Congress as a moral obligation owing by the United States to the county, if ultimately determined by Congress to be such. It was not the seeking of a pure gift from the United States. Indeed, Congress, by the very language of section two of the act of 1892, above quoted, plainly recognized the county's moral right to be paid in some measure in lieu of taxes upon the Indian allotments, though did not recognize that as a legal right. The claim being of this nature, Congress was the only department of the government legally capable of awarding relief to the county in any measure.

There has been much judicial condemnation of so-called lobbying contracts, but we think the weight and reason of the decisions are, in substance, that contracts of the nature here in question are not void as being against public policy. Such contracts, it seems to us, are in principle of the same nature and as free from violation of sound public policy as are contracts of employment looking to the rendering of services by gathering facts, preparing argument thereon and presenting the same to courts of justice and public tribunals, other than legislative tribunals, in support of claimed private rights. We notice in chronological

order some of the decisions bearing upon this question.

In *Trist v. Child,* 21 Wall. (U. S.) 441, there was drawn in question an employment contract for the rendering of service in the presentation to Congress of a money claim against the United States looking to its payment by an appropriation by Congress. The service being performed, the agreed compensation was sought therefor by suit in the trial court of the District of Columbia. On appeal to the supreme court of the United States, it was held by that court that the employment contract and the manner of its performance showed it to be void as against public policy, but, in so holding, Justice Swayne, speaking for the court, said:

"We entertain no doubt that in such cases, as under all other circumstances, an agreement express or implied for purely professional services is valid. Within this category are included, drafting the petition to set forth the claim, attending to the taking of testimony, collecting facts, preparing arguments, and submitting them orally or in writing, to a committee or other proper authority, and other services of like character. All these things are intended to reach only the reason of those sought to be influenced. They rest on the same principle of ethics as professional services rendered in a court of justice, and are no more exceptionable. But such services are separated by a broad line of demarcation from personal solicitation, and the other means and appliances which the correspondence shows were resorted to in this case."

While the use of this language seems there unnecessary in view of the conclusion reached by the court, it nevertheless has been cited and quoted with approval in later decisions of the courts of this country.

In *Denison v. Crawford County,* 48 Iowa 211, there was drawn in question the right of Denison to compensation for services rendered by him to the county in pursuance of an employment contract by which he was

to make application and present facts and arguments in support thereof to the Federal government for swamp lands within the county, or indemnity therefor; there being some existing Federal legislation recognizing such right in the county, but it being found necessary that there be further Federal legislation to make such right of the county effective. Denison, accordingly, collected appropriate data and prepared argument in support of the county's claim, which resulted in further legislation by Congress and allowing of the county's claim, resulting in the government paying to the county a large sum of money. By the employment contract, Denison was to have, as his compensation, one-half of the land or indemnity recovered as the result of his efforts. Holding that the contract was not void as being against public policy, Judge Seevers, speaking for the court, said:

"It was perfectly competent for the county to employ agents or attorneys for this purpose, and an agreement to pay them therefor is valid. Such agents may lawfully draft 'the petition to set forth the claim, attend to the taking of testimony, collecting facts, preparing arguments, and submitting them orally or in writing to a committee or other proper authority, and other services of like character. All these things are intended to reach only the reason of those sought to be influenced.' Swayne, J., in *Trist v. Child,* 21 Wall., 441. . . .

"In these cases, and all others of a like character to which our attention has been called, either the contract on its face, or when viewed in the light of the circumstances surrounding the transaction, clearly disclosed the fact that improper means and influences were to be used to accomplish the desired end. The parties so contemplated and contracted accordingly. Nothing of the kind appears here, and if this contract be declared void, then it will be difficult, if not impossible, to make one providing for the compensation of an agent or attorney who may be employed to prosecute claims be-

fore any department of the government. Conceding it to be proper to look at what was done by Skinner when at Washington City, endeavoring to obtain the passage of the act of Congress of March 5, 1872, for the purpose of arriving at the design and intent of the contract (which we very much doubt), still we are unable to say anything was done by him that was improper to accomplish that result.

"There is nothing which tends to show he used any means except such as were calculated to appeal to the reason and judgment of the members of Congress."

In *Stroemer v. Van Orsdel,* 74 Neb. 132, 103 N. W. 1053, 4 L. R. A. (N. S.) 212, there was drawn in question a claimed compensation for services rendered in pursuance of an employment contract, the services contemplated being application to the department of the interior, and in turn to Congress, for reduction in certain amounts owing to the United States for the benefit of certain Indians; the somewhat involved nature of which need not be here noticed. To effect the purpose sought required legislative authority from Congress. The claim of reduction was manifestly rested upon a sound moral and equitable basis, though it did not have strict legal support. The agreed compensation was to be ten per cent of the amount of the reduction obtained by the service. Neither the contract of employment, by its terms, nor the services rendered, evidenced any improper conduct looking to the securing of the reduction sought. The contract was held valid, and the contention that it was void as against public policy was overruled and the plaintiff by the court awarded compensation accordingly.

In *Herrick v. Barzee,* 96 Ore. 357, 190 Pac. 141, there was drawn in question the validity of a contract of employment of an attorney to seek an appropriation from Congress for loss resulting to his employer,

Barzee, of land because of an overlapping, erroneous government survey. Reviewing the question of the validity of the employment contract, viewed in the light of public policy, citing and reviewing many authorities, and holding the contract to be valid and the plaintiff entitled to compensation according to the contract, Judge Bean, speaking for the court, said in part:

"A contract for services to be rendered by an attorney before the legislature or the Congress of the United States, in securing the passage of a law providing for the payment of a just claim, is not unlawful if it does not contemplate the use of improper means and if the services to be rendered are such as appeal to the reason of those whom it is sought to persuade. Drafting the petition to set forth the claim, collecting facts, preparing and submitting arguments either orally or in writing to a committee or other proper authority, and other services of like character, are within the category of professional services. They rest on the same principle of ethics as professional services rendered in a court of justice and are no more exceptionable. Services of such nature are separated by a broad line or demarcation from personal solicitation and similar means and appliances. 6 R. C. L. p. 734, § 139; 13 C. J. p. 432, § 368; 15 Am. & Eng. Ency. Law (2d Ed.) 970; *Hyland v. Oregon Hassam Paving Co.,* 74 Ore. 1-11, 144 Pac. 1160, L. R. A. 1915C, 823, Ann. Cas. 1916E, 941; *Stanton v. Embrey,* 93 U. S. 549, 23 L. Ed. 983; *Nutt v. Knut,* 200 U. S. 12, 26 Sup. Ct. 216, 50 L. Ed. 348.

"A valid distinction is made between lobbying services in procuring the passage of legislation and strictly legitimate professional services of an attorney directed to that end, it being held that a contract for contingent compensation for services of the latter kind is legal and enforceable. *Stroemer v. Van Orsdel,* 74 Neb. 132, 103 N. W. 1053, 107 N. W. 125, 4 L. R. A. (N. S.) 212, 121 Am. St. Rep. 713; see note, 6 Ann. Cas. 219; *Chesebrough v. Conover,* 140 N. Y. 382, 35 N. E. 633; *Davis v. Commonwealth,* 164 Mass. 241, 41 N. E. 292, 30 L. R.

A. 743; *McBratney v. Chandler,* 22 Kan. 692, 31 Am. Rep. 213.

"If Barzee had a just claim against the United States, he had a right to employ an attorney to render proper professional services. The attorney may receive a compensation consisting of a contingent fee, even where the services are to be performed before Congress. Such a case comes within the well-recognized exceptions to the general rule. *Wright v. Tebbitts,* 91 U. S. 252, 23 L. Ed. 320; *Stanton v. Embrey, supra; Taylor v. Bemiss,* 110 U. S. 42, 3 Sup. Ct. 441, 28 L. Ed. 64; *Brown v. Brown,* 34 Barb. (N. Y.) 533; *Nutt v. Knut, supra; McGowan v. Parish,* 237 U. S. 285, 35 Sup. Ct. 543, 59 L. Ed. 955."

The Oregon court, in the later case of *West v. Coos County,* 115 Ore. 409, 237 Pac. 961, held to the same view of the law, wherein there was presented the question of the validity of an employment contract for services effectually rendered in securing payment of an equitable money claim to the employer, Coos county, from the United States by appropriation by Congress.

In *Stansell v. Roach,* 147 Tenn. 183, 246 S. W. 520, there was drawn in question the validity of an employment contract for the rendering of service in procuring relief from the United States, which had to be in the form of an appropriation by Congress, compensating the claimant for losses resulting from unfortunate conditions attending the performance of a government contract, which losses, in a large measure, it was believed the United States was morally obligated to bear. The facts of that case are too much involved to state them more in detail here. It is enough for us to observe that the claim had a sound moral support. It was held that the employment contract was not void as against public policy, and that Stansell, the employee, was entitled to compensation for services rendered in pursuance of the contract.

In *Kemble v. Weaver*, 200 Iowa 1333, 206 N. W. 83, the Iowa court again had presented to it the question of the validity of an employment contract for services to be rendered looking to the procuring from the state legislature of an appropriation, or some other appropriate relief, claimed by a drainage district because of its inability, as the law then existed, to enforce special assessments against certain lands belonging to the state. To that end, legislation was sought, either to award the district an appropriation sufficient to pay the special assessments chargeable against the state's land, or authorize the district to sell the lands and from the proceeds retain the amounts of the assessments. The services having resulted in legislation furnishing relief satisfactory to the district, compensation was sought by the district's employee, when the validity of the employment contract was challenged as a defense upon the ground that it was void as against public policy. The contract was by the court held to be valid and the employee entitled to compensation according to the terms of the contract. We are of the opinion that the employment contract here in question is not, upon its face, nor because of the manner of the rendering of the service, void as being against public policy.

■■ It is contended in behalf of respondents that the employment contract of the county with the relator and his assignor is void for want of statutory power, express or implied, vested in the county commissioners to enter into such a contract. Among our statutory provisions relating to the powers of counties, and the powers and duties of county commissioners, referring to sections of Remington's Compiled Statutes, are the following:

"§ 3982. The several counties in this state shall have capacity as bodies corporate to sue and be sued in the manner prescribed by law; to purchase and hold

lands within its own limits; to make such contracts, and to purchase and hold such personal property, as may be necessary to its corporate or administrative powers, and to do all other necessary acts in relation to all the property of the county."

"§ 3984. Its powers can only be exercised by the county commissioners, or by agents or officers acting under their authority or authority of law."

"§ 4056. The several boards of county commissioners are authorized and required, . . .

"5. · To allow all accounts legally chargeable against such county not otherwise provided for, . . .

"6. To have the care of the county property and the management of the county funds and business, and in the name of the county to prosecute and defend all actions for and against the county, . . ."

"§ 4075. It shall be unlawful for any board of county commissioners in any county in this state to employ, contract with or pay any special attorney or counsel to perform any duty which the attorney general or any prosecuting attorney is authorized or required by law to perform, unless the contract of employment of said special attorney or counsel shall have been first reduced to writing and approved by the superior judge of said county or a majority of the judges thereof, in writing indorsed thereon; . . ."

We do not lose sight of the rule that county commissioners cannot lawfully directly assume, at the expense of the county, powers and duties expressly delegated by statute to other administrative county officers, as held in *Northwestern Improvement Co. v. McNeil*, 100 Wash. 22, 170 Pac. 338. A careful search of our statutes has not brought to our attention any prescribed power or duty resting upon any other county officer, than the county commissioners, to enable him to act in the county's interest, as contemplated by the employment contract here in question; unless, possibly, the prosecuting attorney may do so. But it seems that even this he could not do at the expense of the county without the sanction of the county commis-

sioners, since no suit in court was contemplated by the employment contract. Indeed, the relief being sought from the United States was not such as could be enforced by action in court, because, as we have noticed, it did not rest upon any such legal or equitable basis as a court of law or equity could recognize. This seems to be a sufficient answer to a claim of want of power in the county commissioners to enter into the original employment contract with Clair Hunt who was not an admitted attorney at law.

However, his successor, Ward Hunt, who by the assignment became the county's employee, is an admitted attorney at law, and was so employed by the county as special attorney within the meaning of § 4075, above quoted, the contract having the approval of the superior judge of the county, if that section has any controlling force touching the legality of this employment contract in so far as the statutory power of the county commissioners to enter into it is concerned.

In *Williamson v. Snohomish County*, 64 Wash. 233, 116 Pac. 675, we held that the county commissioners, under their general statutory powers and duties to care for the county's property and interests, were authorized to employ an alienist to aid the prosecuting attorney of the county in a prosecution in the superior court of one accused of crime, in whose behalf, as a defense, a plea of insanity was made. The prosecuting attorney had no legal authority to incur any such expense in the prosecution, nor did any county officer have any such power, other than the county commissioners. The general powers of the county commissioners were therefore invoked in that behalf, and held legally sufficient to enable them to contract for such services and bind the county to pay therefor; this because that was a proper county expense and no county

officer, other than the county commissioners, could lawfully incur such expense.

We are of the opinion that the employment of relator and his predecessor by the county commissioners was within their statutory powers. We do not concern ourselves in this case with the question of the wisdom of the making of the employment contract here in question. Indeed, we are not asked by counsel on either side to do so. We are only deciding that the commissioners had the power to make the contract, and that, it being faithfully and effectually performed and the county having reaped the benefit thereof, relator is entitled to compensation according to the terms of the contract.

Contention is made in behalf of respondent that mandamus is not available to the relator as an appropriate remedy for the relief he here seeks, and that the trial court was in error in denying respondents' timely motion to dismiss the proceeding for that reason. We have noticed that this is our statutory mandamus proceeding. It was commenced and prosecuted under Rem. Comp. Stat., §§ 1013-1026.

It may not be easy to harmonize all of the holdings of this court since the beginning of statehood touching the question of just when and under what circumstances this procedure is available. The principal difference, in so far as the mere procedure is concerned, between this and an ordinary civil action, is little else than that notice or an alternative writ is the method of bringing the party or parties against whom relief is sought into court, rather than summons; that the judgment awarding relief is, in form, a mandate directing payment or other relief which may be awarded, rather than, in form, an ordinary money judgment, to be followed by execution, or by decree if other relief be awarded; and that the cause for re-

lief is to be stated in the form of an affidavit rather than in the form of a complaint.

Trial of questions of fact, if they arise and become necessary to proper disposition of the controversy, may be had before a jury as well as before the judge, as in ordinary civil actions. These considerations have led to this court regarding this statutory mandamus proceeding as, in substance, a civil action. Accordingly, in *State ex rel. Brown v. McQuade,* 36 Wash. 579, 79 Pac. 207, mandamus was held to be an appropriate and available remedy to be invoked by a school teacher to enforce the issuance to her of a salary warrant for her services as such teacher, though there was a question of fact as to whether or not her salary had been earned. This view of the appropriateness of mandamus as a remedy was adhered to in *State ex rel. Barto v. Board of Drainage Commissioners,* 46 Wash. 474, 90 Pac. 660, presenting the question of the right to compel the issuance of warrants by the commissioners of the drainage district in payment of a construction contract, there being a question of fact as to the performance of the contract to be determined, and which was tried to a jury, incident to the right of having such warrants issued.

Whatever conclusions may be drawn from our decisions as to the appropriateness of our statutory mandamus remedy in seeking relief under varying circumstances, these decisions at least settle the law that municipal corporations can be properly sued in this form of proceeding, when the relief sought is money recovery and the issuance and payment of warrants therefor, resting upon a pure contract obligation, though there be questions of fact to be determined incident to the determination of the proper amount of the recovery. We think we have no decisions to the

contrary, certainly none since the deciding of these two cases.

██ Some contention is made in behalf of respondents that this proceeding was not commenced within the time allowed by law because of the following provision of Rem. Comp. Stat., § 4076.

"Any person may appeal from any decision or order of the board of county commissioners to the superior court of the proper county. Such appeal shall be taken within twenty days after such decision or order, . . Nothing herein contained shall be so construed as to prevent a party having a claim against any county in this state from enforcing the collection thereof by civil action in any court of competent jurisdiction, after the same may have been presented and disallowed in whole or in part by the board of county commissioners of the proper county; *Provided,* that such action be brought within three months after such claim has been acted upon by such board."

The argument is that, this being a mandamus proceeding, the time for commencing it, after disallowance of relator's claim by the county commissioners, was the time prescribed for an appeal from such decision of the county commissioners to the superior court of the county; that is, twenty days. The answer to this contention, it seems to us, is that this proceeding is, in substance, as we have held, a civil action, and that therefore it may be commenced within three months after the disallowance of the claim by the county commissioners. We have seen that the relator's claim was disallowed by the county commissioners on September 5, 1928, and that this action was commenced in the superior court on November 9, 1928. It was therefore timely commenced within the three months' limitation specified in Rem. Comp. Stat., § 4076, above quoted.

██ Some contention is made in behalf of respondents, county auditor and county treasurer, that the

proceeding should, in any event, be dismissed as to them, since they have not evidenced any intent to refuse, respectively, to issue or pay such warrant as the county commissioners may, by our decision, be required to order issued and paid. This, we think, is of small moment in this case. If either the auditor or the treasurer could be personally subjected to the incurring of any expense or to the payment of any costs in this proceeding, they might well complain that the action should be dismissed as to them. But this, in its last analysis, is an action against the county, though the judgment will be a direction to the commissioners, the auditor and the treasurer.

The result will necessarily be that neither the commissioners, the auditor nor the treasurer will be subjected personally to the payment of any expense or costs, either in the superior court or in this court. They will not be required to personally bear any of the expense of this litigation. We see no threatened personal rights of either the auditor or treasurer in this case, and therefore no reason to now dismiss it as to them. They, as well as the county commissioners, have been heard in this action upon the merits touching the relator's right to an allowance of his claim, to the issuance of a warrant therefor and to payment of such warrant. We see no reason for leaving these questions open for further litigation by the auditor or treasurer.

We conclude that the judgment of the trial court, denying to the relator the relief prayed for by him, must be reversed. It is so ordered. The superior court is directed to render its judgment awarding a writ of mandate; commanding the county commissioners to allow and direct the issuance of a warrant in payment of the relator's claim in the sum of $38,-717.65, with legal interest thereon from September 5,

1928, the date of its disallowance by them; commanding the county auditor to issue such warrant upon such action being taken by the county commissioners; and commanding the county treasurer to pay such warrant in due course from funds belonging to the county. The relator is awarded, against the county, his proper costs and disbursements incurred in this court; and shall be awarded by the superior court, against the county, his proper costs and disbursements incurred in that court.

MILLARD, MAIN, HOLCOMB, and FRENCH, JJ., concur.

